## NORTHERN PETROCHEMICAL COMPANY v. THORSEN & THORSHOV, INC., AND OTHERS. WILLIAM J. SUTHERLAND ENGINEERS, INC., THIRD-PARTY DEFENDANT.

211 N. W. 2d 159.

August 10, 1973—Nos. 43178, 43231, 43274.

120

*Carlsen, Greiner & Law, Wellington H. Law, Gislason, Alsop, Dosland & Hunter,* and *Donald F. Hunter,* for appellant Watson.

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, O. C. Adamson II,* and *Clyde F. Anderson,* for appellant T & T.

*Blethen, Ogle, Gage & Krause, Arthur H. Ogle,* and *Kelton Gage,* for appellant plaintiff.

*Farrish, Zimmerman & Johnson,* and *Miles Zimmerman,* for respondent city.

ROGOSHESKE, JUSTICE.

Action for damages arising out of the faulty construction and subsequent reconstruction of an industrial building. This is a consolidation of three appeals from a judgment awarding plaintiff, Northern Petrochemical Company (Northern Petro), the owner of the building, damages from the general contractor, Watson Construction Company (Watson), and the primary architect, Thorsen & Thorshov, Inc. (T & T), and awarding T & T indemnity against the structural engineer, William J. Sutherland Engineers, Inc. (Sutherland). Watson's main issue on appeal is the apportionment of damages between it, T & T, and Sutherland, but it also challenges the total damages awarded Northern Petro, certain evidentiary rulings, and the court's instructions to the jury. Northern Petro appeals from the denial of prejudgment interest and the denial of recovery for damages concurrently caused by water. T & T frankly admits its appeal

was taken solely to protect its procedural status should a new trial be granted on Watson's appeal and urges this court to affirm on all issues. We grant Watson a new trial on the single issue of apportionment of damages and affirm as to all other issues.

This was an extremely long and complicated action which was tried to a jury despite a multiplicity of parties, issues, and legal theories.[1] We have tried to limit our discussion of the facts and issues since we find no issue has significant precedential value and, essentially, what is required is a consideration of all issues upon an in-depth, careful review of the record.

In 1966, Northern Petro contracted with T & T for architectural services in the construction of a new headquarters, which would serve as its office, warehouse, and manufacturing plant. Since T & T did not do structural engineering, it contracted with Sutherland to provide the structural design of the building. In late 1967, Northern Petro contracted with Watson to act as general contractor for the building at a set price of $689,000.

Because of the particular needs of Northern Petro's production processes, the building required a specialized configuration to allow efficient operations. Northern Petro was engaged in the extrusion of plastic film for industrial uses. This film is extruded by drawing tiny pellets of resin through tall, tower-like structures and then cutting the plastic into sheets or tubing. Since the extruders are in excess of 40 feet tall and the finished product is released at the top of the extruder, the manufacturing, or "C," section was designed as a two-story structure with large holes in the upper floor to accommodate the extruder. The warehouse, or "B," section was built on the same level as the upper floor of the manufacturing section in order to facilitate handling of the bulky final product. The office, or "A," section was on the same level as the warehouse section.

---

[1] The trial lasted 3 months and the transcript (without final arguments) is 5,850 pages long. At trial, there were 9 parties, represented by 13 attorneys, with innumerable cross-claims and counterclaims raising issues of negligence, breach of contract, and breach of warranty.

The site selected for the building was readily adaptable to the split-level construction desired. The land was relatively level from the west end of the building for about 200 feet. At this point, at approximately the middle of the warehouse section, it dropped sharply about 20 feet. At approximately the west end of the manufacturing section, the contour leveled out and continued level to the east. A cross-section of the building looked like this:

Construction of the building, which began in the fall of 1967, progressed rapidly. In April 1968, when the building was virtually completed, it became clear that there were major structural flaws in the building. Large cracks were developing in the walls and floor of the manufacturing and warehouse sections; the lower half of the wall between the warehouse and manufacturing sections (hereafter the BC wall) and the steel columns in the manufacturing sections were out of plumb and seriously bowed to the east.

At this point, a consulting engineer was hired to find the cause of the problems and suggest remedial action. Steel cables had been installed to reinforce the building, but the deterioration continued. It became apparent that the building was moving toward the east in fits and starts. This movement was halted only when large wood shorings were used to brace the building.

It was eventually determined that the cause of the eastward movement was the inability of the BC wall to withstand the horizontal pressures of the earthfill against the west or warehouse side. The wall was being pushed to the east and transmit-

ting this movement through the rest of the building. If no remedial measures had been taken, the building would ultimately have collapsed. In an unusual effort to mitigate damages, Watson, T & T, and Northern Petro agreed to cooperate in the reconstruction of the building. Watson and T & T agreed to perform necessary construction and architectural services, for which Northern Petro would pay T & T its regular fee for additional services and pay Watson on a cost-plus basis. The parties specifically agreed that these services would be without prejudice to the ultimate determination of liability.

Until actual reconstruction began, it was believed that the sole reason for the building's failure was a structural defect in the support for the BC wall. The consulting engineer found that the structural design of the building provided seriously inadequate lateral support for the BC wall. Even if every other facet of the construction of the building had been performed perfectly, this design defect would have caused the collapse of the building if remedial steps were not taken.

In order to alleviate the pressures on the BC wall, the first step in reconstruction was to remove the floor and underlying fill from the eastern third of the warehouse section. As the floor was being taken up, however, it became clear that the structural design was not the only major flaw in the building. In this area, and in others that were subsequently uncovered, it was found that more than two-thirds of the reenforcing steel for the concrete flooring was lying on the fill and not embedded in the concrete and the underlying fill had not been compacted to the degree required by the specifications. The result of these omissions during construction of the building was to leave large voids under the floor which caused cracking and uneven settling of the floor. Correcting these faults required a massive reconstruction process, which took approximately 8 months.

The jury found that Northern Petro's out-of-pocket costs for reconstruction were, in round figures, $346,000 and that Northern Petro suffered additional damages in the amount of $140,000 for diminution in the value of the building, $267,000 for loss of

profits because of late occupancy of the building, and $50,000 for excess operating costs while awaiting occupancy of the building.

The amount of each item of damages is amply supported by the evidence, but various challenges are made to the appropriateness of particular items of damages. Watson urges (a) that Northern Petro cannot recover for both reconstruction costs and loss of value; (b) that damages for loss of profits and excess operating costs are speculative and conjectural; and (c) that the damages for loss of use of the building are controlled by a stipulated damage clause of the construction contract. Northern Petro objects to the denial of damages concurrently caused by subsurface waters and defective construction. We affirm on all these issues.

The facts and authorities support the trial court's approval of the jury's award of damages for both reconstruction costs and diminution in value after reconstruction. The preferred measure of damage in a case such as this is to take either the cost of reconstruction in accordance with the contract, if this is possible without unreasonable economic waste, or the difference in the value of the building as contracted for and the value as actually built, if reconstruction would constitute unreasonable waste. Marshall v. Marvin H. Anderson Const. Co. 283 Minn. 320, 167 N. W. 2d 724 (1969); H. P. Droher & Sons v. Toushin, 250 Minn. 490, 85 N. W. 2d 273 (1957); Restatement, Contracts, § 346. In the instant case, some reconstruction was essential in order to avoid the complete collapse of the building. In order to avoid prohibitive reconstruction costs, however, the repair work was limited to that necessary to make the building safe and usable. The walls and columns that were pushed out of plumb never rebounded to their original positions, various cracks in the floors and walls remain, and the strain on the building was such that higher maintenance costs were likely in the future. The uncontradicted testimony was that, even after construction, the value of the building was $140,000 less than what it would have been

had the building been properly constructed. These facts bring the case within the rule of Rinkel v. Lee's Plumbing & Heating Co. 257 Minn. 14, 20, 99 N. W. 2d 779, 783 (1959), that "when the repairs have not fully restored the building the owner is entitled to the remaining diminution in value so long as the total damages awarded do not exceed the difference in the value before and after, or the cost of restoring the building to substantially its former condition, whichever is less."

Watson's challenge to the award of damages for loss of profits and excess operating costs must also fail. Loss of use has long been held to be a proper subject of damages where, as here, the loss is a direct and proximate result of the injury complained of and the damages are within the contemplation of the parties at the time of making the contract. Marshall v. Marvin H. Anderson Const. Co. *supra;* see, Liljengren Furniture & Lbr. Co. v. Mead, 42 Minn. 420, 44 N. W. 306 (1890). Loss of profits has similarly been recognized as an appropriate measure of the damages resulting from loss of use when the anticipated profits can be proved to a reasonable, although not necessarily absolute, certainty. See, 5B Dunnell, Dig. (3 ed.) § 2535, and cases cited. In the instant case, the evidence on loss of profits was superbly marshalled and, in part because of the industry-wide inability to produce sufficient extruded plastic film to meet the demand, easily met the burden of reasonable certainty required for recovery of lost profits. The excess operating costs caused by the delay in occupancy were recognized in Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc. 268 Minn. 176, 128 N. W. 2d 334 (1964), as being an element of lost profits rather than a conceptually distinct measure of damages. While in Indianhead Truck Line we held the proof of excess costs was too speculative to allow recovery, we have no trouble finding the proof sufficiently certain to affirm the court's award in the instant case.

Other challenges to the total amount of damages awarded are without merit. Watson argues that a contract provision setting a completion date with per diem liquidated-damage bonus clauses

for early or late delivery controls the damages for loss of use. We are convinced, however, that the trial court properly found that this provision was intended to apply only to "normal" delays in the rate of construction, not to the extraordinary 8-month delay resulting from defective construction and design and necessary reconstruction of the building.

Northern Petro's cross appeal from the court's denial of some $59,000 damages caused concurrently by Watson's defective construction and the effects of subsurface water must also fail in light of Northern Petro's contractual waiver of any claim against the contractors, architects, and engineers for losses due to any insured peril, including ground water, covered by the builders' risk insurance purchased by Watson. We hold the water damage complained of was within the terms of this waiver agreement.[2]

In sum, we hold that the total award of damages to Northern Petro, which excludes the water damage, was properly computed and supported by the evidence. Northern Petro is thus entitled to the judgment ordered by the trial court of $743,501.96.

Although the total award of damages is proper, we have difficulty with the apportionment of damages among the various parties found liable. In its final order for judgment, the trial court determined that T & T was solely liable for, in round figures, $24,000, Watson was solely liable for $262,000, and Watson and T & T were jointly and severally liable for $457,000.[3] Wat-

---

[2] This holding is without prejudice to Northern Petro's right to proceed to reopen this issue should the insurance company refuse to pay.

Our resolution of this issue renders moot Watson's appeal from the directed verdict in favor of the city of Mankato. The only claims against the city arose out of water damage caused by an allegedly faulty installation of water pipe. Since Watson is not liable for the water damage, it has no grounds for complaining of the directed verdict in favor of the city.

[3] T & T's liability was purely derivative from the wrongful acts of Sutherland, its structural engineer. Thus, the court gave T & T rights to indemnity from Sutherland to the full amount of damages T & T

son raises several challenges to this apportionment, including the trial court's interpretation of the jury's special verdict, the failure of the court to request a comparison of causal fault where both Watson and Sutherland were liable under theories of negligence as well as under breach of contract and breach of warranty, and the insufficiency of the evidence to support the court's apportionment of damages.

We agree with Watson that the evidence does not support the apportionment of damages ordered by the trial court. The evidence is clear that the design defect, if not corrected, would have caused the eventual collapse of the building. The movement of the BC wall and the steel columns in the manufacturing section were directly caused by the failure to design adequate structural support for the wall. Viewing the evidence in the light most favorable to the verdict, the cracking and settling of the floors can be found to be solely caused by Watson's defective compaction of fill and failure to properly reinforce the concrete.

Unfortunately, some reconstruction costs necessary to correct various defects in the building were not readily apportionable to either a design defect or a construction defect. The removal of the eastern third of the warehouse floor, for example, was necessary both to correct Watson's construction error which caused the floor to settle and crack and to install a "deadman" to correct Sutherland's design error which allowed the BC wall to shift to the east. Additionally, both to limit the pressure on the BC wall and to avoid the necessity of recompacting the fill under the floor, a more expensive structural slab replaced the original slab on grade concrete floor in this part of the warehouse section.

The evidence presented by Northern Petro did not purport to apportion the various elements of damages it sustained among

must pay Northern Petro. Sutherland has not appealed, however, and we understand it is financially unable to meet its liabilities, so, for the sake of convenience, we will discusss T & T's liability as if it would have to bear the full brunt of any judgment against it and Sutherland.

the potentially liable parties. Northern Petro quite properly—and, we might add, quite competently—set about the task of proving the amount of damages it sustained because of the failure of the parties to furnish it with the safe and habitable building contemplated by the contract. Evidence of reconstruction costs introduced by Northern Petro would support apportionment only among the various job orders needed to repair the building. As to some items of costs, such as grouting under the office floor, the evidence permitted assignment of responsibility of a single party. As to other items, such as the removal and repair to the eastern part of the warehouse floor described above, it was impossible without additional evidence to apportion the costs between the liable parties. Watson did introduce some evidence intended to aid apportionment of damages, but this evidence was hastily assembled and so discredited on cross-examination that we cannot hold that the jury was required to give it credence. Neither T & T nor Sutherland presented any evidence which would substantially aid the jury in apportioning damages.

The apportionment of damages where two or more persons approximately simultaneously cause harm to another through independent acts of negligence is discussed in Mathews v. Mills, 288 Minn. 16, 178 N. W. 2d 841 (1970). The theories underlying liability in the case at bar are essentially claimed negligent breaches of contractual obligations; there are no claims of intentional breaches. Thus, we believe the rule announced in Mathews governing liability and apportionment of damages between multiple tortfeasors acting independently should apply. In Mathews, we adopted the "single injury" rule, which is that where it is not reasonably possible to make a division of the damage caused by separate acts of negligence, closely related in point of time, the negligent parties, even though they acted independently, are jointly and severally liable. We also adopted the rule advocated in Restatement, Torts 2d, § 433 B (2):

"Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of

the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."

Finally in Mathews, we set out the roles of the judge and jury where the difficult question of apportionment is raised with respect to any damages properly awarded but which are not, in terms of causation, clearly separable (288 Minn. 23, 178 N. W. 2d 845):

"Having decided that the burden of establishing that the injuries in a multiple-accident situation are capable of apportionment rests upon the defendants so claiming, we further hold that it is the function of the trial court to determine whether such burden has been met. Whether or not the harm to the plaintiff is capable of apportionment among two or more causes is a question of law. Once the trial court determines that the harm is capable of apportionment, the question of actual apportionment of damages among several causes becomes one of fact to be determined by the jury. See, Restatement, Torts (2d) § 434 (1) (b), and comment d."

In the instant case, the apportionment issue understandably was buried under the multiplicity of issues and arguments raised by the various parties to the lawsuit. While Watson's evidence on the issue of apportionment was far from compelling, it was sufficient to require a determination by the trial court whether the damages to Northern Petro were capable of apportionment. The task of apportionment was unusually difficult in this case because of the problem of isolating the cause of each item of damage. Various reconstruction costs and derivative damages could be viewed as either apportionable or as "single indivisible injuries." For example, Watson argues that the building defects for which it was responsible could have been repaired in a shorter period of time than those growing out of the defective design and that therefore the derivative damages for loss of use should

not have been apportioned by simply using the same ratio as the apportionment of reconstruction costs.

Without indulging in speculation, we are unable to determine upon this record what the apportionment of 57 percent of the damages assessed against both Watson and T & T should be. The primary reason is the insufficiency of the evidence. Had the court held after trial that Watson—who alone sought to limit its liability on the ground that this amount of damages was capable of further apportionment—failed to sustain its burden of proof, we would be inclined to affirm. However, the court held in its post-trial memorandum that the 57 percent of the total damages assessed jointly and severally against Watson and T & T was incapable of apportionment. Under the facts, there is no causal relationship between the negligent design and the negligent breach of contract; both are independent and separate negligent breaches of contractual obligations. The "single injury" rule compels a determination that the reconstruction-cost damages, as well as the derivative damages, are as a matter of law susceptible of apportionment despite any difficulty of carrying the burden of proof by the party seeking apportionment.[4]

The parties' failure to request the court and jury to discharge their respective roles concerning the proper submission of the question of apportionment is reflected in the jury's response to a specific question that 57 percent of the damages could not be segregated between Watson and T & T. Despite the extremely serious defect in the structural design, T & T, through the imputed liability of Sutherland, was found solely liable for only 3 percent of the total damages and jointly liable with Watson for 57 percent of the damages. Thus, assuming financial responsibility on the part of both Watson and T & T, Watson will eventually

[4] The evidence falls short of supporting T & T's argument and the court's determination that the joint and severable liability of Watson and T & T was incapable of apportionment because Watson's negligent breach of contractual obligations was of such magnitude that all of the reconstruction cost was mandatory without reference to the defective design of the BC wall.

pay over two-thirds of the damages and T & T will pay less than one-third. It seems to us that, in view of the serious damage to the building flowing from the shifts of the BC wall and the costly repairs required to correct that condition, the apportionment ordered by the court is unreasonable. Because we hold that there should be a limited trial between defendants found liable, we need not treat Watson's other challenges to the court's interpretation of the jury award and the apportionment awarded by the trial court.

The other issues raised on appeal are without merit. Watson's argument that Northern Petro waived any claims against Watson's deviation from the contract specifications by the architect's failure to object must fail since there was no evidence that Northern Petro had any knowledge of these deviations and the construction contract specifically provided that the architect's supervision shall not relieve the contractor of his obligation to perform in accordance with the contract specifications.

Watson also challenges the admission of hearsay testimony of soil density tests which tended to show that Watson had failed to properly compact the fill under the warehouse and manufacturing sections of the building. The primary challenge to this evidence is that it was erroneously admitted under the business-records exception to the hearsay rule since the tests were allegedly self-serving and intended to exonerate the testing company from liability. If any error were made in the admission of this evidence, it was surely harmless, particularly in light of the disposition of the case. The failure to properly compact the soil could be causally related only to the cracking and settling of the floors and the washing away of the fill by ground water under the manufacturing section. As to the floor defects, the only other possible cause was not placing reinforcement steel in the concrete slab—a defect attributable only to Watson. Furthermore, since we have affirmed the court's finding of waiver for the water damage under the manufacturing section earlier in the

opinion, any imputation of liability to Watson for the separately awarded damage is without effect.

Since we are ordering a new trial on the apportionment of damages for other trial errors, any possible prejudice to Watson in the apportionment of damages, as opposed to the finding of liability, need not be discussed here. Should the testimony challenged by Watson be used in the new trial, however, we do feel Watson should be given sufficient latitude in cross-examination to bring out any self-serving or litigation-oriented motives in the soil-compaction testing. At that time, the admissibility of the evidence under the business-records exception to the hearsay rule can be redetermined.

Finally, Northern Petro's appeal from the denial of prejudgment interest must fail where neither the total amount of damages nor the apportionment of damages was readily ascertainable before trial. Potter v. Hartzell Propeller, Inc. 291 Minn. 513, 189 N. W. 2d 499 (1971); Moosbrugger v. McGraw-Edison Co. 284 Minn. 143, 170 N. W. 2d 72 (1969); Employers Lia. Assur. Corp. v. Morse, 261 Minn. 259, 111 N. W. 2d 620 (1961).

Accordingly, we affirm the trial court's award of total damages to Northern Petro in the sum of $743,501.96. We also affirm the judgment dismissing all claims against defendants other than Watson, Sutherland, and T & T. The sole issue that need be retried is the apportionment of damages among Watson, Sutherland, and, through the imputed liability of Sutherland, T & T.

While a remand for a limited retrial is unusual, we feel it is required in the interest of justice in order to protect Northern Petro from the expense of a new trial caused solely by the failure of the defendants to properly litigate the apportionment of damages. This result does not contradict our ruling in Juvland v. Mattson, 289 Minn. 365, 184 N. W. 2d 423 (1971), since that case dealt solely with the apportionment of causal fault under our comparative negligence statute, Minn. St. 604.01.

The retrial of the issue of apportionment should require only a determination of the disputed fact question of the cause of

distinct and well-proved items of damages. We believe we may assume that the parties, with the aid of the trial court, will be able to stipulate to many of the relevant facts, which will avoid an unduly long trial on this narrow issue. Although it is possible that Watson's efforts to limit its joint liability for the 57 percent of the damages will again be unsuccessful because of the absence of persuasive evidence as to the causal relationship between its negligent breach of contractual obligations and specific items of damages, we cannot make that assumption on this record.

Since the retrial involves only Watson and T & T, our disposition does not affect Northern Petro's right to collect its full award.

Affirmed in part and remanded for a limited new trial without costs or disbursements to any party.

### UPON PETITION FOR REARGUMENT

On October 12, 1973, the following was filed:

IT IS ORDERED that the petition for rehearing be and is denied. To clarify what we acknowledge was not made specifically clear, we intend that the retrial be limited to the apportionment of 57 percent of the damages both with respect to reconstruction costs and derivative damages assessed against T & T and Watson jointly. As plaintiff will now be authorized to collect its full judgment, including the unallocated 57 percent thereof from either or both defendants, application may be made to the district court for an order protecting their liability to each other pending the results of the retrial.

BY THE COURT
WALTER F. ROGOSHESKE
Associate Justice

MR. CHIEF JUSTICE KNUTSON took no part in the consideration or decision of this case.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.