In re the Matter of the COMMODORE HOTEL FIRE AND EXPLOSION CASES.

No. 81–827.

Supreme Court of Minnesota.

Sept. 17, 1982.

Austin D. Ditzler and Timothy J. Adler, Minneapolis, for appellant Summit Court, Inc.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Clyde F. Anderson and Laura S. Underkuffler, Minneapolis, for NSP & Grudem Bros. Co.

Suzanne E. Flinsch, City Atty., St. Paul, for City of St. Paul.

KELLEY, Justice.

In this action, appellant Summit Court, Inc. (Summit) seeks to recover from respondents damages, in excess of those damages reimbursed by its own property damage fire insurance, it sustained as a result of the Commodore Hotel fire and explosion on February 15, 1978. Following a verdict of the jury assessing damages, appellant's motion in the Ramsey County District Court for an additur or, alternatively, for a new trial was denied. Appellant claims the trial court erred (1) in admitting evidence pertaining to negotiations between its representative and a representative of its property damage fire insurer shortly after the

fire; (2) in ruling that structural damages should be measured by estimated rather than actual cost of restoration; and (3) in limiting loss-of-use damages to "loss of profits." We affirm in part, reverse in part and remand the case to the trial court for a trial on the issue of loss-of-use damages.

Summit owned the Commodore Hotel in St. Paul. Business operations in the hotel included bar and restaurant facilities as well as room rentals. The hotel was severely damaged as the result of a fire and explosion on February 15, 1978. Following the fire, a number of lawsuits were commenced against the appellant and against the respondents. Those cases were consolidated for trial, and the liability issues were tried separately by the court without a jury. Subsequently, Summit commenced this action to recover damages not covered by its own property damage fire insurance.

Shortly after the fire loss, appellant made claim for personal property damage and for restoration damages against Commercial Union Insurance Company (Commercial Union), its property damage fire insurer. Appellant hired Supornick and Associates, a fire adjusting firm, to assess the fire loss. Ultimately, a settlement was reached with Commercial Union by which restoration damages to be paid by Commercial Union to appellant were determined to be $851,-721.61.[1] Because appellant was underinsured at the time of the fire, it did not receive the full negotiated amount for restoration damages. Instead, it was paid $108,971.61 less than the negotiated amount.[2]

■ 1. Summit first contends the trial court erred in permitting various witnesses to testify about the negotiations and the resulting settlement of appellant's fire loss restoration claim against Commercial Union. It argues that Rule 408, Minnesota Rules of Evidence,[3] bans the admission of evidence of negotiations to compromise, or the compromise itself, to prove the amount or invalidity of its claim against respondents. Appellant relies on *Frey v. Snelgrove,* 269 N.W.2d 918 (Minn. 1978), wherein we stated that as a general rule the amount paid in settlement should never be submitted to a jury. *Id.* at 923. In our view, *Frey* is not applicable to this case. Rule 408 does not render inadmissible evidence of settlement unless there existed a dispute as to the validity or amount of the underlying claim. We note the Committee Comment—1977 on Rule 408 indicates a prerequisite to exclusion is the existence of a genuine dispute.[4] This court and others

---

1. The settlement also included personal property damages. However, those damages are not in dispute in this litigation.

2. Both Supornick and General Adjustment Bureau, which represented Commercial Union, hired contractors to estimate the cost of repair. Both projected estimates of repair in excess of $1 million, but since the available insurance coverage was only $850,000, appellant agreed to settle for the policy limits. Later Commercial Union invoked the co-insurance clause because the building was substantially underinsured. Following arbitration, appellant was assessed a penalty in the stated amount. This was the exact amount the jury found the appellant's loss to be for damage to the building.

3. Rule 408, Minnesota Rules of Evidence, provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the court of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

4. Committee Comment—1977 on Rule 408, Minnesota Rules of Evidence, provides:

This rule will substantially alter present practice in Minnesota affording more protection to compromise discussions than presently exist. The increased protection is justified to the extent that it will encourage frank and free discussion to compromise negotiations and avoid the necessity for parties to speak in terms of hypotheticals. Not only are offers of compromise or the acceptance of com-

have held offers of settlement are inadmissible only when there existed an actual controversy at the time of the offer. *See Hiram Ricker & Sons v. Students International Meditation Society,* 501 F.2d 550, 553 (1st Cir. 1974); *Daltex, Inc. v. Western Oil & Fuel Co.,* 275 Minn. 509, 514–15, 148 N.W.2d 377, 382 (1967); *Person v. Bowe,* 79 Minn. 238, 239, 82 N.W. 480, 481 (1900).

■ At the time the negotiations were taking place between Supornick and Gene Nelson, representing respectively Summit and Commercial Union, there was no dispute concerning the amount of appellant's building loss—it was approximately $851,-000. There was no dispute or lawsuit pending. The loss figure was communicated to Thomond R. O'Brien who was 97% owner of the common stock of Summit. He never disavowed the figure. Subsequently, an attorney representing Summit wrote two letters to the Commissioner of Insurance advising that the parties had agreed to $851,-000 as its Commodore Hotel building loss.

Here, the evidence does indicate that while appellant and its insurer each attempted to negotiate a favorable settlement, there is no showing that either accepted a "high" or "low" figure with a view toward avoiding litigation. *Hiram Ricker & Sons v. Students International Meditation Society,* 501 F.2d 550, 553 (1st Cir. 1974). In this case, the factors set out in *Frey* have been largely negated by the evidence concerning the motivation and bargaining positions of Summit and its insurer.

Moreover, the agreement by Summit to accept the figure might be construed as an admission by Summit as to the building loss sustained or as impeachment of O'Brien's trial position with respect to that loss.

Finally, it was not until after substantially all of the pertinent negotiation and settlement evidence had been admitted over the only objection of "relevance,"[5] that appellant made objection relying on Rule 408.[6]

■ 2. Appellant next contends that the trial court abused its discretion and was overly restrictive in limiting plaintiff in its proof of damages. When property is not totally destroyed, the ordinary measure of damages is the difference in value before and after the loss, or the cost of restoration, whichever is less. *Rinkel v. Lee's Plumbing & Heating Co.,* 257 Minn. 14, 20, 99 N.W.2d 779, 783 (1959). The parties agree the trial court was correct in electing to have appellant's property damages measured by "restoration"—the reasonable cost of repairing the Commodore Hotel to its pre-fire condition. The two contractors who made repair cost estimates shortly after the fire on behalf of Summit's insurance representative and the adjuster for Commercial Union were permitted by the court to testify as to the building loss. When the building was rebuilt after the fire, it was converted into a condominium complex. Appellant sought to call the architect who drew the condominium plans and the president of the construction corporation which carried out restoration and conversions for the purpose of establishing the total cost of repair and

---

promise inadmissible but also all statements made in compromise negotiations. Contra, *Esser v. Brophey,* 212 Minn. 194, 196–99, 3 N.W.2d 3, 4, 5 (1942). *Before the rule of exclusion is applicable there must be a genuine dispute as to either validity or amount.* Absent such a dispute there is no real compromise. The rule does not immunize otherwise discoverable material merely because it was revealed within the context of an offer of compromise. Finally the rule only excludes evidence of compromise on the issue of liability, not for other possible purposes as suggested in the rule. See *Esser,* id. at 199, 200, 3 N.W.2d at 6. (emphasis added)

5. Obviously, the evidence was relevant either as constituting an admission by Summit as to building loss sustained or as impeachment of O'Brien's trial position with respect to Summit's claimed loss. Appellant raises the point that Supornick could not bind Summit by his value opinion. That issue need not be addressed since it is clear that O'Brien, Summit's president, made the adjuster's acts those of Summit under the principle of ratification.

6. Subsequent to the settlement a dispute did arise between appellant and Commercial Union when the latter sought to invoke the co-insurance clause so as to reduce the dollar figure which Summit and Commercial Union had previously agreed to be the amount of the loss.

conversion. Because the restoration and conversion resulted in a building which was substantially different from the destroyed structure and more valuable than it would have been if merely restored to its pre-fire condition, appellant then sought to have those witnesses "back out" the restoration and conversion cost items associated solely with the conversion to condominiums. They contended the result would establish the actual cost of restoration of the building to its original condition.

The court excluded the evidence because its relevance was outweighed by its tendency to confuse the jury—the actual restoration and conversion being so dissimilar to mere reconstruction to pre-fire conditions— and because the actual figures of cost of reconstruction and conversion were inflated by lapse of time.[7]

Even if evidence had some probative value, if its introduction may confuse or mislead the jury, the trial judge has discretion to exclude it. Minn. R. Evid. 403; *Rose v. Koch,* 278 Minn. 235, 249, 154 N.W.2d 409, 420 (1967). *See also E.C.I. Corp. v. G.G.C. Co.,* 306 Minn. 433, 237 N.W.2d 627 (1976); *Fulsom v. Egner,* 248 Minn. 156, 79 N.W.2d 25 (1956). In our view, the record amply sustains the trial court's exercise of discretion in excluding the proffered testimony.

3. Appellant next argues that the trial court erred in restricting damages for loss of use of the damaged property to loss of profits. Appellant requested an instruction that would have instructed the jury, in effect, that loss-of-use damages could be com-

puted by deducting from the gross revenue which would have been received during the period of business interruption caused by the fire and explosion the operating costs that would have been incurred. Moreover, appellant offered to prove the specific ongoing "overhead" expenses it incurred while the Commodore Hotel building was being repaired such as real estate taxes, insurance premiums, mortgage interest, food and beverage license fees and other non-operating expenses. This offer was denied. In its instructions, the court gave a definition of lost profits which encompassed the narrow accounting definition of net profits.[8] As the result of being given that instruction, it is understandable that the jury failed to find any "loss of profits."

Appellant sought to show that these ongoing expenses amounted to more than $200,000 during the 18 months of restoration. Appellant sought to show that from 1975 through 1977 the Commodore Hotel was a deficit operation in the true accounting sense, losing in excess of $140,000 each year.[9] Therefore, in the accounting sense, appellant has no claim for lost profits if that means net profits. Nevertheless, appellant claimed it had sustained a loss as a result of the fire and explosion, to-wit, a loss of contribution to fixed overhead from loss of revenue from appellant's bar, hotel and rental facilities. This loss, if appellant's contention is correct, amounted to approximately $10,000 per month.[10]

The trial court relied on *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.,* 297 Minn. 118, 211 N.W.2d 159 (1973),

7. Before so ruling, the court had allowed some of the "conversion" testimony. The testimony so heard by the court convinced him that such evidence was unduly confusing to the jury.

8. The sole instruction of the court on this question was: "Part (c) 'Loss of profits?' Net profits means the gain which remains from gross sales after deduction of all expenses and costs incurred." Prior to giving this instruction in chambers counsel discussed the submission. While there is some indication appellant's counsel acceded to this definition, a full reading of the proceedings clearly indicates that at all times he contended on-going fixed costs were recoverable.

9. The losses actually were: 1975—$137,600; 1976—$141,800; and 1977—$165,200.

10. John McCarthy, appellant's accountant, prepared a forecast of gross income and expenditures during the time of restoration assuming the fire had not occurred. Based on the figures of November-December 1977, this forecast indicated that in the 18 months following the fire appellant would have had $14,300 left after subtracting costs of goods sold and operating expenses, to cover fixed unabatable monthly expenses of taxes, licenses, insurance premiums and mortgage interest payments.

where, in holding that the plaintiff there could recover excess operating costs encompassing extra employee, transportation, warehousing and other expenses incurred by plaintiff because of its inability to have use of a new building, we stated that such costs were "an element of lost profits rather than a conceptually distinct measure of damages." *Id.* at 125, 211 N.W.2d at 166. In our view, *Northern Petrochemical* is distinguishable from the present case. The issue raised here—continuing fixed overhead expenses—was not there raised. That was an action on a building contract. The delay in completion had no effect on the plaintiff's fixed overhead expenses of the kind here claimed by the appellant in this tort action. Nonetheless, in that contract action the owner was allowed to recover certain additional expenses caused by the delay.

In this case, even though Summit could show no loss of net profit in the accounting sense, it did seek to show that prior to the fire its gross profits met substantially all of its 'fixed unabatable overhead expenses which continued post-fire and during restoration. Summit was forced to find other sources to pay these unabatable continuing overhead expenses. The debt incurred by it to meet such expenses was a direct result of the February 15, 1978 fire and explosion. Summit claims that since it can recover for loss of use these items are part of its claim for loss of use.

Minnesota apparently has not addressed the issue of whether costs of continuing overhead are part of loss of use damages recoverable in a tort action to recover for injuries or destruction of real property. Other jurisdictions have allowed continuing costs of fixed overhead to be recoverable.[11]

The rationale of those courts which have allowed recovery for on-going unabatable fixed overhead costs is that such allowance puts a proper share of those costs upon the tortfeasor who damaged the property rather than upon the innocent person whose property was damaged.

We have, however, spoken to the issue in the context of an action for damages arising as a result of a breach of contract. In *Northern Petrochemical,* we recognized that loss of use is properly a measure of damage where the loss is a direct result of the injury and where such damages are within the contemplation of the parties at the time of making the contract. 297 Minn. at 124, 211 N.W.2d at 166. In *Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc.,* 268 Minn. 176, 195–96, 128 N.W.2d 334, 348 (1964), we approved recovery of damages which included, among other elements, clerical and office expense, interest on an escrow deposit, and attorneys fees incurred by plaintiff as a result of the defendant's refusal to perform a contract. We there noted that these items were definite and susceptible of proof, whereas alleged savings in operating costs which plaintiff there claimed were remote and speculative. *See also Bergquist v. Kreidler,* 158 Minn. 127, 196 N.W. 964 (1924).

■ When a chattel is damaged, not amounting to total destruction in value, the damages include compensation for loss of use. Restatement (Second) of Torts § 928 (1979). Comment (b) to this section states that in addition to damages for dimunition in value, the claimant is entitled to loss of use of which the defendant's tort is the legal cause.

11. *Baltimore & Ohio Railroad Co. v. Commercial Transport, Inc.,* 273 F.2d 447, 449 (7th Cir. 1960) (railroad allowed to recover overhead expenses in making repairs to property damaged by negligent motorist); *Hartford Electric Light Co. v. Beard,* 3 Conn.Cir. 323, 213 A.2d 536, 537 (1965) (reasonably certain overhead costs of repair are a proper element of damage and recoverable); *New Jersey Power & Light Co. v. Mabee,* 41 N.J. 439, 442, 197 A.2d 194, 196 (1964) (no reduction in damages for deprecia- tion of damaged pole); *Warren Telephone Co. v. Hakala,* 105 Ohio App. 459, 460, 152 N.E.2d 718, 719 (1957) (indirect cost of on-going overhead, in addition to the direct costs for labor and materials, recoverable); *Polk v. Oklahoma Gas & Electric Co.,* 410 P.2d 547, 549 (Okl. 1966) (utility allowed to recover from negligent motorist that damaged its utility pole on-going overhead costs of employees who had to repair the damage).

We see no reason why similar rules should not apply in a tort action seeking recovery for damage sustained by the owner of income-producing real property. Therefore, we hold that if an owner of income-producing real property which has been damaged by a tortfeasor can establish by a fair preponderance of the evidence that, but for the tort, his gross income would have been sufficient to pay all or part of his fixed unabatable overhead costs during the reasonable time of restoration or repair, as an element of loss of use of the property the owner may recover from the tortfeasor those costs that would have been paid from the lost income.

Since the trial court ruled that evidence of those costs could not be considered by the jury, and since the court limited recovery to loss of net profits, we remand this case for a new trial on the sole issue of damages for loss of use sustained by appellant as the result of loss of gross income to pay fixed and unabatable overhead costs.

Affirmed in part, reversed in part and remanded for a new trial on loss-of-use damages.

COYNE, J., took no part in the consideration or decision of this case.