John M. CASHMAN, and Cashman Seed & Fertilizer, Inc., Appellees,

Courtesy Enterprises, Inc., aka CEI, and Donald L. Gaddis, Appellees,

v.

ALLIED PRODUCTS CORPORATION, Appellant.

CASHMAN SEED & FERTILIZER, INC., Appellant,

v.

COURTESY ENTERPRISES, INC. a/k/a CEI, Donald L. Gaddis, and Allied Products Corporation, Appellees.

Nos. 84–5046, 84–5052, 84–5114 and 84–5122.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1984.

Decided May 15, 1985.

Victor Savikas, Chicago, Ill., for Allied Products.

Stephen J. Smith, Owatonna, Minn., for appellees.

Before HEANEY, ROSS and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

Allied Products Corporation (Allied) appeals from a $330,000 judgment granted below to Cashman Seed & Fertilizer, Inc., (Cashman) for damages arising from a dispute over the sale of a fertilizer blending tower. Allied challenges the award of damages for lost profits and an award of attorneys' fees to Cashman. Cashman cross-appeals, challenging the district court's refusal to award it prejudgment interest, its granting of judgment n.o.v. on a jury verdict of $24,000 for lost time spent by Cashman officers in attempting to secure contract performance and effective cover, and its refusal to award Cashman a risk multiplier to the lodestar amount of the attorneys' fees award. For the reasons set forth below, we affirm.

## I. BACKGROUND.

Cashman is a Minnesota corporation which has sold fertilizer and seed in Owatonna, Minnesota since 1910. John N. Cashman and two of his sons presently operate the business. On July 16, 1979, Cashman made a contract with Courtesy Enterprises, Inc. (CEI), a farm implement distributor, to purchase a 90-ton hydraulic blending tower manufactured by Allied's Bush Hog/Kraus division. CEI sent the purchase order to Allied two days later. After about 45 days, Allied returned the purchase order and deposit check to CEI because the hydraulic towers were no longer available. On October 17, 1979, CEI ordered a rotary, non-hydraulic blender

from Bush Hog/Kraus. CEI delivered this blending tower to Cashman on February 11, 1980 and erected it at a new location three miles from Cashman's downtown plant.

According to Cashman, this substitute blender never worked properly. After numerous attempts to fix it, Cashman contacted Allied seeking a replacement. In February, 1981, Allied refused to replace the blender tower, and Cashman tore it down and replaced it with a hydraulic blending tower made by a different manufacturer. Cashman was not able to have the replacement blender installed until after the spring 1981 planting season.

Cashman filed suit on July 23, 1981 in Minnesota state court against Allied, CEI, and Donald Gaddis, president of CEI, for breach of contract, breach of warranty, and fraud. The case was removed to federal district court for the District of Minnesota. Cashman alleged that the fertilizer blending tower delivered to it did not have the warranted capacity and therefore constituted a breach of the sales contract, breach of various warranties, and misrepresentation under the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69, subd. 1. Allied contended that it was not a party to any contract with Cashman and never made any warranties or representations to Cashman concerning the blender.

The parties tried the case before a jury in September and October, 1983. On October 28, 1983, the jury returned a verdict for Cashman and against the three defendants for breach of contract, breach of express and implied warranties, and misrepresentation. The jury awarded $354,000 in damages as follows: $75,000 in general damages, $245,000 in lost profits, $24,000 in lost salaries of officers, and $10,000 in hauling expenses. The jury apportioned liability for these damages among the three defendants as follows: $354,000 (or 100 percent) attributable to Allied, $109,000 to CEI, and $10,000 to Gaddis.

Cashman also sought to recover prejudgment interest. The parties agreed to submit both the factual and legal issues concerning this claim to the court, which denied the claim. The district court granted the defendants' motion for a judgment notwithstanding the verdict on the lost officers' salaries award of $24,000. The district court also granted Cashman's motion for attorneys' fees under the Minnesota Consumer Fraud Act in the amount of $82,110.42.

Allied then filed this appeal. Allied does not appeal the findings of breach of contract, breach of express or implied warranties, or misrepresentation. Rather, Allied contends on appeal that Cashman should not recover damages for lost profits because the evidence was speculative and the related expert testimony lacked foundation. Allied also contends that the district court's award of attorneys' fees was improper under the Minnesota Consumer Fraud Act.

Cashman cross-appeals, arguing that the district court erred in refusing to award prejudgment interest, in granting judgment n.o.v. on the verdict of $24,000 in damages for lost officers' salaries, and in failing to use a risk multiplier in awarding attorneys' fees. We discuss each of these issues in turn.

## II. DISCUSSION.

### A. Lost Profits.

■ Allied argues that the jury's award of $245,000 in damages to Cashman for lost profits is based on insufficient evidence and inadmissible expert testimony. Minnesota law [1] provides that damages for lost profits may be recovered so long as these damages are not speculative, remote, or conjectural. *Hornblower & Weeks-Hemphill Noyes v. Lazere*, 301 Minn. 462, 467, 222 N.W.2d 799, 803 (1974); *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 125, 211 N.W.2d 159, 166 (1973). Plaintiffs must show: (1) that

---

1. The case is before us on diversity jurisdiction and the parties agree that Minnesota law applies.

the profits lost are a direct result of the defendant's conduct, and (2) that the amount of reduction of profits may be ascertained with reasonable certainty. *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. at 125, 211 N.W.2d at 166. Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount. *Polaris Industries v. Plastics, Inc.*, 299 N.W.2d 414, 418–19 (Minn.1980); *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn.1977); *Northern States Power Co. v. Lyon Food Products, Inc.*, 304 Minn. 196, 229 N.W.2d 521, 525 (1975). On appeal, we will overturn a jury verdict only where the evidence is susceptible to no reasonable inferences sustaining it. *McHenry County Credit Co. v. Feuerhelm*, 720 F.2d 525, 528 (8th Cir.1983).

■ Cashman introduced extensive evidence for the jury to consider in determining lost profits. It introduced evidence of several methods of showing the lost tonnage in fertilizer sales for the years 1980 and 1981. Four of Cashman's customers testified that they had to purchase their fertilizer elsewhere because Cashman was unable to deliver the product when needed on short notice due to problems with its blender. Roger Schrom, a fertilizer dealer and former Cashman employee, testified that in 1978 and 1979, Cashman had inadequate capacity to meet customer demand, often running two to three days behind in filling orders. There was also evidence in the record of an overall increase in demand for fertilizer in 1980 and 1981 due to the absence of a federal set-aside program paying farmers for not planting, high commodity prices, and planting conditions conducive to high fertilizer sales.

John C. Cashman testified that if the 90-ton blender had been in working order, Cashman would have increased sales by 2,500 to 3,000 tons per year. He testified that with the new blender he could handle 800–900 tons per day, which is three times his old capacity; he had access to the product, trucks, spreaders and tenders in the years in question. Thus, he concluded that a 30–40% increase in sales, or 2,500–3,000 tons per year, would be a conservative estimate of lost business.

Cashman offered as an alternative method of calculating lost profits a statistical analysis of Cashman's state market share from 1971–1982 compiled by Joseph Abdo, its accountant and a business consultant. Abdo calculated Cashman's market share on both a calendar year and a crop year basis. He testified that there was a close correlation between state fertilizer sales and Cashman's fertilizer sales from 1971 to 1977; that during the years 1978–1981 there was a strong demand statewide for fertilizer, but that in 1980 and 1981 Cashman's share dropped from 1/187 to 1/229; and that Cashman's market share increased back to 1/185 in 1982 (when the new replacement hydraulic blender was installed) despite a decrease in statewide demand. Abdo concluded that, had Cashman had the new blending tower operating in 1980 and 1981, he would have sold at least 4,881 more tons of fertilizer based on these market share calculations, and that this resulted in total lost profits of $233,800.

Cashman also introduced Schrom's expert testimony concerning lost profits based on Cashman's share of the fertilizer market in Steele County. He testified that Cashman's local market share for the 1980 crop year was 19.4%, and 23.2% for 1981. The new replacement blender resulted in a market share of 28.1% for the 1982 and 1983 crop years. Schrom concluded that Cashman would have had this market share (28.1%) two years earlier had the Allied blending tower worked properly. Consequently, he concluded that Cashman lost 6,557 tons in sales for these two years.

The jury thus had before it calculations of lost tonnage for 1980 and 1981 ranging from 4,881 to 6,557. Cashman also introduced net profit figures which ranged from $37.50 to $49.98 per ton. It awarded Cashman $245,000 for lost profits, which we note is approximately the highest lost ton-

nage figure (6,557) multiplied by the lowest net profit figure ($37.50 per ton).

Allied argues that these figures are speculative, primarily because Cashman's evidence of lost profits falsely assumes that greater fertilizer blending capacity in 1980 and 1981 would necessarily have resulted in proportionately greater fertilizer sales. Allied contends that Cashman's calculations ignore other market factors which would have affected fertilizer sales in the relevant years.

We conclude that the jury could reasonably infer from the evidence presented that Cashman had in fact suffered lost fertilizer sales in 1980 and 1981 due to the failure of the Allied blender to work properly. While it is true that, as Allied contends, market factors such as price, demand, and competitor reaction would have some effect on Cashman's sales, there was ample evidence in the record from which the jury could infer that despite these factors, the defective blender caused Cashman to lose fertilizer sales. Cashman testified that the shift in farmers' preference from bagged to bulk fertilizer and increased usage in the late 1970s resulted in higher demand in 1980 and 1981. Schrom testified that 1980 and 1981 were high demand years for fertilizer in the area. There was also evidence in the record that Cashman's problems in meeting this demand became readily apparent to farmers, who in turn took their business to other fertilizer dealers.

The amount of Cashman's lost sales was admittedly not proven with absolute precision. But, as the Minnesota Supreme Court held in *Leoni v. Bemis Co.*, 255 N.W.2d at 826, once the plaintiff has shown the fact or existence of damage, problems in proving the precise amount will not preclude recovery. While any one of Cashman's methods of calculating lost profits may have been problematic standing alone, all of the methods in combination provided the jury with ample evidence from which to fix the amount with reasonable certainty. The evidence before the jury also allowed it to consider various market factors in arriving at the proper award. The fact that

Cashman had been in business since 1910 means that the jury did not face the problems of ascertaining lost profits for a new business. *See Leoni v. Bemis Co.*, 255 N.W.2d at 826. The market share information presented by Cashman assisted the jury in determining lost profits based on Cashman's established business records. We thus hold that there was sufficient evidence in the record from which the jury could reasonably ascertain lost profits.

Allied argues further that the district court improperly admitted the expert testimony of Abdo and Schrom concerning lost profits because neither witness was qualified to render an opinion on Cashman's estimated future sales or to project its market share, and because their opinions were based on unsupported assumptions. Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Whether to admit expert testimony is a decision left to the discretion of the district court, and we will reverse a district court's admission of expert testimony only when we find an abuse of that discretion. *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir.1984); *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1328 (8th Cir.1984). In this case, there was no abuse. Abdo, as an accountant and business consultant to Cashman, had sufficient skill and experience to testify concerning Cashman's lost profits using market share data and Cashman's business records. Schrom's extensive experience in the agricultural fertilizer business in Steele and Mower Counties provided significant assistance to the jury in understanding the fertilizer market and Cashman's lost sales. *See Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1207 (9th Cir.1975), *cert. denied*, 425 U.S. 959, 96

S.Ct. 1741, 48 L.Ed.2d 204 (1976) (expert witnesses who testified on lost profits, market share in antitrust case were properly qualified as experienced businessmen capable of providing information and opinions based on practical experience).

Allied also argues that Abdo's and Schrom's expert testimony was inadmissible under Fed.R.Evid. 703 because it was based on false assumptions. Allied's arguments about this testimony simply reiterate its contention concerning the sufficiency of the evidence of lost profits, which we have addressed above. The objections go to the weight of this evidence rather than to its admissibility. Accordingly, we affirm the district court's decision to admit the testimony as a proper exercise of its discretion.

**B. Attorneys' Fees Under the Minnesota Consumer Fraud Act.**

██ Under the Minnesota Consumer Fraud Act, Minn.Stat. § 325F.69, subd. 1, and Minn.Stat. § 8.31, subd. 1, subd. 3a, a private plaintiff may recover attorneys' fees and costs for an action for fraud, misrepresentation, or deceptive practices. The district court awarded Cashman $82,-110.42 in attorneys' fees pursuant to this act. Allied contends that this award was improper because the district court erroneously instructed the jury that they could find that defendants made misrepresentations even if Allied did not intend to deceive Cashman.[2]

Allied cites a Minnesota Supreme Court decision, *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720 (Minn.1983), in support of its argument that intent to deceive is required to find liability for misrepresentation. In *Jenson,* the court decided that:

the statute does not create strict liability. Section 325F.69, subd. 1, speaks of "fraud" and "misrepresentation," of promises that are "false" and statements that are "misleading" or practices which are "deceptive." We conclude that these terms, given their plain, ordinary mean-

ing, denote at least some degree of culpability. In the absence of a clear legislative intent, we think it is inappropriate to impose a strict liability standard here * * *.

335 N.W.2d at 728.

The district court's instruction to the jury on misrepresentation was as follows:

Silence, in other words, may be a misrepresentation if it relates to a material fact and there is a duty to disclose the matter. This duty may arise out of a relationship of trust or confidence, an inequality of bargaining position, an awareness that the undisclosed fact would prevent a previous representation from being misleading or an unequal access to information.

It is not necessary that the one who makes the misrepresentation knows that it is false. If an individual makes a statement which turns out to be false, and makes it of his own knowledge when in fact he does not know whether it is true or false, that is a misrepresentation.

Even if a misrepresentation is made innocently, it would operate as a fraud upon plaintiff if made unqualified or as of the representor's own knowledge.

██ Without ruling on the precise nature of the intent element of misrepresentation under Minnesota law, we conclude that the district court's instructions were entirely consistent with *Jenson.* The instructions clearly required "some degree of culpability" by the defendants; *Jenson* only holds that the consumer fraud statute does not create strict liability. We thus decline to reverse the district court's award of attorneys' fees.

██ In Cashman's cross-appeal, it argues that the district court erred in failing to add a risk multiplier to the lodestar or base fee in determining attorneys' fees. The district court determined that whatever risks counsel for Cashman undertook did not justify a multiplier above the lodestar

**2.** CEI and Gaddis also submitted briefs as non-appealing parties concerning the attorneys' fees issue, contending the award was improper. We reject their arguments for the same reasons discussed in relation to Allied's appeal of the attorneys' fees award.

amount. We will not overturn a district court's award of attorneys' fees absent clearly erroneous factual findings concerning the basis of the award, or abuse concerning the discretionary margin involved in its allowance. *Jorstad v. IDS Realty Trust,* 643 F.2d 1305, 1312 (8th Cir.1981); *International Travel Arrangers, Inc. v. Western Airlines,* 623 F.2d 1255, 1274 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980). We find no such error or abuse of discretion in the district court's analysis of the risks for Cashman's counsel, nor do we find any misapplication of law involved in its determination.

### C. Prejudgment Interest.

The jury awarded Cashman $75,000 in general damages, which was the total paid for the Allied blending tower and repairs less value received by Cashman. On its cross-appeal, Cashman argues that the district court erred in refusing to award prejudgment interest paid on the purchase and reconstruction of the tower and the loss of advantageous financing resulting from defendant's failure to perform the contract.

 We disagree. The district court properly noted that under Minnesota law, a plaintiff may only recover prejudgment interest where the damages are known or readily ascertainable prior to trial. *Polaris Industries v. Plastics, Inc.,* 299 N.W.2d at 417–18; *Alley Construction Co. v. State,* 300 Minn. 346, 219 N.W.2d 922, 926–27 (1974). The district court observed that Cashman's prejudgment interest claims were difficult to pinpoint, and we note that Cashman fails in its brief on appeal to mention any specific dollar amounts constituting the general damages award which merit prejudgment interest. The district court concluded that Cashman's payments for the original tower and the replacement blender did not equal its damages because the value of the goods received had to be deducted from these payments and this value was disputed and contingent. The district court also held that Minnesota law prohibited recovery of interest on repair

costs under *Parkside Mobile Estates v. Lee,* 294 N.W.2d 327, 328 (Minn.1980). It further dismissed Cashman's claim that recovery for prejudgment interest is compelled in this case as incidental damages under the Uniform Commercial Code, Minn. Stat. § 336.2–715(1). Without more precise evidence showing non-contingent damages before us, we must affirm the district court's decision on this issue as not clearly erroneous.

### D. Lost Officers' Salaries.

 The jury awarded Cashman $24,000 in damages for the time spent by two of its officers in seeking compliance with the contract with Allied. The district court granted Allied's motion for judgment notwithstanding the verdict concerning these damages. It held that the law requires "a finding that some portion of Cashman Seed's officers' salaries would not have been paid out but for the breach of contract or warranties by defendants," citing *Wilson v. Marquette Electronics, Inc.,* 630 F.2d 575, 585–86 (8th Cir.1980), and that there had been no such showing.

Cashman cites a Minnesota case, *Indianhead Truck Line, Inc. v. Hvidsten Transport, Inc.,* 268 Minn. 176, 128 N.W.2d 334, 348 (1964), affirming a trial court's award of $8,093 in miscellaneous expenses which included time spent by officers in seeking consummation of the contract. We find *Indianhead* distinguishable, and thus affirm the district court's decision here. In *Indianhead,* the Minnesota Supreme Court affirmed a few thousand dollars for officers' time spent on contract compliance, but reversed the trial court's award of $311,120 for lost profits. The court also expressly stated that the award for lost time was proper "under the circumstances here involved." *Id.*

In this case, we have affirmed an award for lost profits, and absent any showing that Cashman's officers' salaries would not have been the same but for defendant's conduct, we conclude that the district court's decision was not clearly erroneous. Here, Cashman is fully compensated for all

of the profits it would have made while having paid the same salaries to its officers.

## III. CONCLUSION.

For the reasons set forth above, the judgment of the district court is affirmed.