ALPEX COMPUTER CORPORATION,
Plaintiff,

v.

NINTENDO CO., LTD. and Nintendo
of America Inc., Defendants.

No. 86 Civ. 1749 (KMW).

United States District Court,
S.D. New York.

July 18, 1991.

Christopher Hall, Jones, Day, Reavis & Pogue, New York City, for plaintiff.

John Kirby, Mudge, Rose, Guthrie, Alexander & Ferdon, Alfred P. Ewert, Morgan & Finnegan, New York City, for defendants.

KIMBA M. WOOD, District Judge.

Plaintiff Alpex Computer Corporation ("Alpex") moves for an order pursuant to Federal Rules of Evidence 408 precluding defendants Nintendo Company, Ltd. and Nintendo of America ("Nintendo") from introducing any evidence concerning plaintiff's efforts to compromise disputed claims regarding the '555 patent and the amounts involved in those efforts to compromise. For the reasons set forth below, the court grants plaintiff's motion.

### Background

This case arises from a dispute over the validity and alleged infringement of U.S. Patent No. 4,026,555 (the '555 patent), a patent that involves the earliest video games. On January 18, 1991, the court denied the parties' cross-motions for summary judgment. That opinion sets forth the facts underlying this dispute in some detail; familiarity with that opinion is assumed. The court will repeat only those facts necessary for an understanding of this motion.

Although the parties disagree over exactly how to characterize the evidence Alpex seeks to preclude, the evidence falls roughly into three categories. The first category includes documents relating to Alpex's offers to license the '555 patent to a large number of companies in the video game industry. The second category includes exhibits relating to licenses granted by Alpex to seven companies "after extensive business negotiations and without any commencement of litigation." Defendant's Mem. of Law in Opposition ("Nintendo Mem.") at 38. The third category includes licenses agreed to by four companies during litigation and certain documents relating to those licenses.

After receiving the right to sue for past infringement of the '555 patent from Fairchild Camera & Instrument Co., the original licensee of the patent, Alpex embarked on a program to combat what it viewed as widespread infringement of the patent. As part of this program, outside counsel for Alpex wrote letters to a number of companies in the video game industry in December 1979 notifying them of Alpex's view that they were infringing the '555 patent. The letter to Atari, one of the leaders in the video game industry at the time, is illustrative. Alpex's counsel informed Atari that "[a] number of the TV games which Atari is manufacturing and selling under the name PONG clearly infringe the '555 patent." Nintendo Appendix at Exh. 2. The letter concluded with Alpex offering "to extend a non-exclusive license under its patents on a royalty basis." *Id.* This notice led to "extended negotiations," Alpex Mem. of Law (Alpex Mem.) at 4, and eventually a settlement between Alpex and Atari under which Atari paid for and received a non-exclusive license. Alpex's counsel sent similar letters to Mattel and Bally. As was the case with Atari, the notice to Mattel resulted in extended negotiations, a settlement, and a license. Nintendo seeks to designate as trial exhibits a variety of documents from these two negotiations, including letters between the parties describing the negotiations over the license price, news articles about the Atari settlement, Bankruptcy Court pleadings describing the Mattel settlement, and the actual license agreements. *See* Alpex Mem. at 4–5.

In 1983, after the settlement with Atari and another with Magnavox, counsel for Alpex sent infringement letters to approximately 70 companies. These letters announced that Alpex had recently granted licenses under the patent to Atari and Magnavox, and stated that Alpex had "recently obtained information indicating that your company manufactures and/or sells video game cartridges and/or consoles which may infringe the subject patent." Nintendo App. at Exh. 3. "We would prefer to resolve this matter without litigation," the letters continued, "and the purpose of this letter is to advise you that our client is prepared to extend a nonexclusive license under the '555 patent on a paid-up or royalty basis." *Id.*

As a result of Alpex's efforts, as expressed in these and subsequent letters, six companies entered into license agreements with Alpex without litigation, including

Mattel, Imagic, Sierra-on-Line, Texas Instrument, IBM, and Epyx. From the course of the negotiations leading to these licenses, defendants seek to designate as trial exhibits numerous documents that discuss the history of the negotiations, disputes over the size of the settlement offers, the license agreements themselves, and bankruptcy court documents describing and approving the agreements.

As part of its campaign, Alpex sued six companies alleged to have sold or manufactured products that infringed on its patent. The first suit filed was against Magnavox in 1981 and was settled, with Magnavox receiving a non-exclusive license, in December 1982. Several years later, Alpex brought suit against five additional companies: Activision, Coleco, Commodore, Tandy, and Parker Brothers. Alpex has agreed to settle with four of the companies; the action against Parker Brothers has been stayed pending the outcome of this case. Nintendo wishes to designate as trial exhibits a variety of documents that pertain to these actions, including documents setting forth the terms of settlement and various letters between Alpex and the prospective licensees.

### Discussion

#### I. Preclusion Under Rule 408

Federal Rules of Evidence 408 provides, in pertinent part, that:

> Evidence of (1) furnishing or offering or promising to furnish or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either liability or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Alpex argues simply that the same considerations that led to the enactment of this rule, namely "the promotion of the public policy favoring the compromise and settlement of disputes," F.R.Evid. 408 advisory committee's note, compel the granting of this motion. Faced with widespread infringement of its patent over a long period of time, Alpex contends, the company followed a reasonable course of action in alerting companies it believed were infringing the patent and then attempting to negotiate a settlement or filing suit or both, as the circumstances warranted.

#### A. Evidence of Unsuccessful Offers to License the Patent

Nintendo counters with several different arguments. It argues first that, as to the documents relating to Alpex's licensing offers that did not result in a completed agreement, Rule 408 does not apply because no actual dispute existed at the time. Nintendo characterizes Alpex's offers to license the patent as merely the "opening gambit" in an expected negotiation and thus not protected by the privilege afforded offers to compromise. Because some of those licensing offers never received a response, Nintendo argues, no dispute could possibly have existed, and Rule 408 does not bar the admission of these offers.

▮▮▮ Nintendo's reading of this requirement of Rule 408, however is too narrow. All that is needed for Rule 408 to apply is an actual dispute, or at least an apparent difference of opinion between the parties as to the validity of a claim. *Dallis v. Aetna Life Ins. Co.*, 768 F.2d 1303, 1307 (11th Cir.1985); 2 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 408[01] at 408–10 (1990). At the time it began its efforts to license the '555 and related patents, Alpex believed that many companies in the industry sold or manufactured products that infringed the patents. It is reasonable to assume that the alleged infringers believed either (1) that their products did not infringe the patent in question, or (2) that even if they did, the patent was not valid, or (3) that they could somehow get away with infringing. Alpex's offers to license the patent were sent only to those it believed were infringing on the patent. Nintendo would read these letters, in essence, as part of an irreducible whole; without a response, the letters could not be evidence of a dispute, because two parties are necessary for a dispute to exist. But this logic assumes that communications in

response to Alpex's infringement letters are required in order for this court to hold that a dispute existed between the parties. This is not the case. By infringing on the patent, or at least selling products that Alpex reasonably believed were infringing on the patent, the infringers signalled that they held an opinion at variance with Alpex's position. The dispute or difference of opinion begins with the act of infringement; Alpex's letters—those that provoked responses as well as those that did not—were offers to compromise that dispute and thus fall within the ambit of Rule 408.

Such a result is consistent with the underlying policy of the rule. Each case of infringement represents a potential lawsuit. By offering to settle what it viewed as meritorious infringement claims, Alpex hoped to avoid litigation, a hope it made explicit in some of the letters sent to alleged infringers. *See, e.g.*, Nintendo App. at Exh. 3 (Letter to Answer Software Corp.: "We would prefer to resolve this matter without litigation."). This is not a case where application of Rule 408 would have the effect encouraging baseless threats of litigation. *See Ullmann v. Olwine, Connelly, Chase, O'Donnell, and Weyher*, 123 F.R.D. 237, 243 (S.D.Ohio 1987) (Rule 408 aims to promote dispute resolution, not threats of litigation). Alpex's belief that the companies to which it sent notices of infringement were indeed infringing on Alpex's patents implied the existence of dispute or a difference of opinion sufficient to meet the threshold requirement of Rule 408.

### B. Evidence Relating to Licenses Agreed to Without Litigation

■ Nintendo argues that none of the license agreements agreed to by Alpex without litigation is barred by Rule 408. In its view, "none of the these licenses was agreed to during litigation and none was the result of threats of imminent litigation." Rather, Nintendo argues, these licenses represent the results of ordinary business negotiations in an industry-wide licensing program, and thus Rule 408 does not apply. In support of this position, Nintendo relies upon *Big O Tire Dealers v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372–73 (10th Cir.1977) (communications between parties prior to threatened litigation merely business negotiations, rendering Rule 408 inapplicable), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). But even *Big O*, Nintendo's principal support for its position, makes clear that litigation need not have actually commenced for Rule 408 to apply. In upholding the lower court's refusal to exclude evidence of certain settlement discussions between the parties, the court held that "the point of threatened litigation [was] a clear cut-off point" for the application of the Rule 408 privilege. *Id.* at 1373.[1] Similarly, in *Olin Corp. v. Insurance Co. of North America*, 603 F.Supp. 445, 449–50 (S.D.N.Y.1985), the court held that settlement discussions that occurred at a time when the plaintiff "contemplated" litigation, but had not yet commenced it, should be excluded under Rule 408. Here, none of the parties that entered into a licensing agreement with Alpex did so without the threat of litigation from Alpex. For example, in writing to outside counsel for Alpex, patent counsel for Texas Instruments summarized the history of licensing negotiations between the two companies, and denied that any Texas Instruments products infringed upon Alpex's patents, but concluded that when "faced with your indication of Alpex's willingness to bring suit against Texas Instruments under the '555 Patent, and recognizing the costs and inconvenience of litigation," an "offer to settle this matter" was warranted. Alpex App. at Exh. E. Similarly, in August 1984 the Vice President and General Counsel of Sierra-on-Line, another company Alpex accused of producing infringing products, wrote to Alpex's patent counsel outlining a licensing agreement he believed would "settle this matter without the necessity of

---

1. The court notes that several commentators have criticized the use of such a strict, objective standard for measuring when a dispute begins for Rule 408 purposes. *See, e.g.*, 23 C. Wright and K. Graham, *Federal Practice and Procedure*, § 5306, at 213–14; Brazil, *Protecting the Confidentiality of Settlement Negotiations*, 39 Hastings L.J. 955 (1988).

litigation." Alpex App. at Exh. E. It is clear that this entire category of documents that Nintendo seeks to designate as trial exhibits was generated only under the threat of litigation from Alpex, the "clear cut-off point" discussed by the court in *Big O.*

Even were this not the case, there are several other factors that distinguish the communications between Alpex and the four companies that entered into licensing agreements with Alpex without actually being sued, from the business communications at issue in *Big O.* First, the communications in this case took place largely between lawyers. Most of the letters alleging infringement were written by outside counsel for Alpex, a fact that suggests that Alpex believed litigation was a real possibility from the outset of its licensing efforts; many of the responses were written by lawyers for the companies accused of infringement. One court has found that the participation of outside counsel in negotiations is a relevant factor in determining whether a dispute existed for Rule 408 purposes. *Olin Corp.*, 603 F.Supp. at 450. Second, the facts of *Big O* suggest that the party seeking to exclude the evidence in that case was guilty of overreaching, and that to apply Rule 408 in that situation would enable that party to succeed in strongarming an opponent. 23 C. Wright and K. Graham, *Federal Practice and Procedure*, § 5306, at 213–14. No evidence of similar tactics exists in this case.

C. Evidence Relating to License Agreements Reached During Litigation

■ The final category of documents Alpex seeks to preclude Nintendo from offering at trial pertain to the licensing agreements reached between Alpex and four other companies during ongoing litigation. Numerous Federal Circuit decisions have held that offers to license patents made during pending litigation are inadmissible under Rule 408, *see, e.g., Deere & Co. v. International Harvester Co.,* 710 F.2d 1551, 1556–57 (Fed.Cir.1983); *Medtronic, Inc. v. Intermedics, Inc.,* 799 F.2d 734, 741 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987), a fact

that Nintendo concedes. Indeed, the Claims Court, surveying the law of the Federal Circuit with respect to the use of offers or settlements to show the prior licensing practices of a patentee and Rule 408, held that "it appears that the majority view of the CAFC is to exclude efforts, offers and settlements directed at compromising a disputed claim." *Dynamics Corp. of America v. United States,* 5 Cl. Ct. 591 (1984), *aff'd in pertinent part, rev'd in part,* 766 F.2d 518 (Fed.Cir.1985). Nevertheless, Nintendo argues that the unique facts of this case, in which Alpex made "repeated industry-wide offers to license the patent at a standard price," Nintendo Mem. at 45, and then adhered to those terms even when forced to litigate its claims, compel a different result. Nintendo's argument is unavailing. The mere fact that Alpex offered to settle with a large number of companies does not render the protection afforded such offers under Rule 408 any less applicable. As discussed, *supra,* Alpex accused every corporation to which it offered a license (except Fairchild) of infringing on its patents. It threatened most of them with litigation. The court has previously rejected the distinction that Nintendo attempts to draw between licensing offers made in the context of business negotiations and those that occurred in the context of litigation. That Alpex offered the same terms to those companies it threatened with litigation early in its licensing efforts as it did to those it actually sued is immaterial. Regardless of the terms of the settlements between Alpex and Magnavox, Activision, Tandy, and Coleco, the agreements were made in settlement of litigation; any documents or other evidence relating to these agreements thus plainly fall within the protection of Rule 408.

II. *Waiver of the Rule 408 Privilege*

■ Nintendo also argues that even if the licenses granted by Alpex during ongoing litigation fall within the scope of Rule 408, Alpex has deliberately waived the protection generally afforded under the rule by disclosing the fact and the terms of its

settlements outside the context of this litigation. More specifically, Nintendo contends that Alpex waived the rule by disclosing information regarding the terms of previous settlements in letters to other companies Alpex alleged were infringing its patents, and with whom it hoped to reach similar settlements. In addition, Nintendo suggests that the fact that the press published details of several of the licensing agreements destroys whatever protection those agreements might have once enjoyed, and thus enables Nintendo offer those details as evidence in this case.

Nintendo bases its waiver argument on Weinstein and Berger, *supra* at p. 5, ¶ 408[2] at 408–20, and one case cited in the treatise, *Bank of America Nat'l. Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339 (3d Cir.1986). *Bank of America* is a case that involved the unsealing of a settlement agreement filed with the court in a related litigation; the case stands for the proposition that "once a settlement is filed in the district court, it becomes a judicial record, and subject to the access accorded such records," and that the policy favoring settlement of disputes does not outweigh that right to access. *Id.* at 345. It has nothing to do with the admissibility of a settlement agreement under Rule 408. *Id.* at 344.[2]

Nor does the Weinstein and Berger treatise provide support for Nintendo's waiver argument. Weinstein and Berger contend that Rule 408 should be treated as a species of privilege, which would permit waiver of the privilege by the parties. "Treating the rule as one of privilege," they argue, "would in no way undermine its policy objectives, because those parties for whose benefit the exclusionary protection was designed, would have to waive the right to have such evidence excluded." Weinstein and Berger, *supra, p. 5,* at 408–20. The primary problem with this argument is that Weinstein and Berger appear to be arguing in favor of some form of permissive waiver, one that would *allow* waiver of the

privilege by the parties to the settlement negotiations. They say nothing of the mandatory waiver that can occur in the attorney-client privilege context, an analogy Nintendo implicitly draws. By bringing this motion, Alpex has made clear that it has no desire to waive the protections of Rule 408.

Finally, Nintendo claims that the policy underlying the rule supports its position that the publication of the existence of a settlement or of its details outside of the context of the case at hand should act as a waiver of Rule 408. Although superficially attractive, this argument, too, is unavailing. Rule 408 is designed to promote "the public policy favoring the compromise and settlement of disputes." F.R.Evid. 408 advisory committee's note. It is true that complete confidentiality of settlements may promote this goal. But Rule 408 is merely a rule of evidence, which promotes compromise in one limited way—it provides that evidence of compromise is not admissible to show invalidity of a claim or its amount. "Although the intent of FRE 408 is to foster settlement negotiations, the sole means used to effectuate that end is a limitation on the admission of evidence produced during settlement negotiations for the purpose of proving liability at trial." *NAACP Legal Defense and Educ. Fund v. Department of Justice*, 612 F.Supp. 1143, 1146 (D.D.C.1985); *see also Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland*, 122 F.R.D. 447 (S.D.N.Y.1988). Accordingly, the rule "limits a document's relevance *at trial,* not its disclosure for other purposes." *Center for Auto Safety v. Department of Justice*, 576 F.Supp. 739, 749 (D.D.C.1983) (emphasis added). The issue of whether a party to a settlement agreement has publicized the existence or the terms of that agreement outside the context of the trial at hand does not enter into a court's decision under Rule 408.

Moreover, it is not at all clear from the facts of this case that Alpex's publicizing

---

**2.** The court notes that the one decision it has found that does address this issue dismissed the argument made here by Nintendo out of hand. *See Abundis v. United States,* 15 Cl.Ct. 619

(1988) (fact that settlement a matter of public record does not render Rule 408 inapplicable; court unaware of precedent to support contrary view).

of its settlements was inconsistent with either the broad reading courts have traditionally given to Rule 408, or the policy rationale behind the rule. As one commentator has written, "statements made with a clear purpose to resolve the existing dispute should be protected, even though uttered outside the negotiating arena." 2 D. Louisell and C. Mueller, *Federal Evidence* § 171, at 465 (1985). In outlining the terms of previously agreed to settlements in letters to other alleged infringers, Alpex was attempting to resolve disputes, just as it had in letters that did not mention other settlements. The rationale underlying the rule thus actually supports the exclusion of those offers made by Alpex that included details of previous settlements, contrary to Nintendo's contention.

### III. Admission of Alpex's Licensing Offers to Rebut Claim that the '555 Patent Merits Pioneer Status

 A pioneer patent is one that "mark[s] a distinct step in the progress of the art . . . as opposed to a mere improvement of prior or analogous techniques." *Shields v. Halliburton Co.*, 667 F.2d 1232, 1238 (5th Cir.1982). A patent found to have pioneer status merits the application of a broader scope of equivalents in determining whether a particular product infringes the patent. *See Perkin–Elmer Corp. v. Westinghouse Electric Corp.*, 822 F.2d 1528, 1532 (Fed.Cir.1987). Invoking the provision of Rule 408 that states that the rule does not require exclusion when the evidence is offered for a purpose other than "to prove liability for or invalidity of the claim or its amount," F.R.Evid. 408, Nintendo argues that it should be allowed to rebut Alpex's claim to pioneer status for its patent with evidence of Alpex's licensing program. Pointing to affidavits submitted by Alpex's experts in opposition to Nintendo's summary judgment motion, Nintendo contends that Alpex will attempt to portray its patent as the foundation of the video game industry. Nintendo hopes to counter that portrayal using evidence of Alpex's licensing program to show that the industry has consistently placed a low value on the patent.

Nintendo thus seeks to take advantage of this provision of the rule to introduce evidence it is otherwise precluded from offering. This effort faces two hurdles. First, Nintendo has offered little support for the assumption that underlies its argument—namely, that a determination of pioneer status turns on a showing of commercial success. Indeed, Nintendo does not cite one case in support of this proposition. Second, even identifying a purpose for admission other than the validity of a claim or its amount does not compel a finding in favor of admission. In stating that the exclusion of evidence of compromise is not *required* when it is offered for another purpose, Rule 408 appears to leave to the court's discretion whether that evidence is appropriate. *See Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510–511 (2d Cir.1989) (trial court has broad discretion as to whether to admit evidence of settlement negotiations offered for "another purpose"); *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106–07 (5th Cir. Unit B 1981) ("another purpose" exception to Rule 408 surely not intended to undercut policy behind rule). As one court has written, "it is well recognized . . . that the risks of prejudice and confusion entailed in receiving settlement evidence are such that often Rule 403 and the underlying policy of Rule 408 [to encourage settlement] require exclusion even when a permissible purpose can be discerned." *Stacey v. Bangor Punta Corp.*, 620 F.Supp. 636, 637 (D.Me.1985) (quoting 2 D. Louisell and C. Mueller, *Federal Evidence* § 170, at 272 (1978)).

Even if this evidence were somehow relevant to the question of pioneer status, the court must still weigh, under F.R.Evid. 403, its probative value against the prejudice that would result from its admission. Because Nintendo has not offered support for its contention that the lack of commercial success of a patent shows that it does not merit pioneer status, the court views the probative value of this evidence to be minimal. At the same time, the danger of prejudice from such evidence is great. It is unlikely that a jury would limit its consideration of this evidence to the purpose Nin-

tendo proposes; rather, a jury is likely to use it for the improper purpose of gauging the worth of Alpex's claim, and is likely to accord it substantial weight. Therefore, the court will not allow Nintendo to introduce evidence of Alpex's licensing offers to rebut claims that the '555 was a pioneer patent in its field. The court notes that this ruling with regard to Nintendo's attempts to introduce the licensing offers for rebuttal purposes is preliminary, and that should the evidence at trial warrant a reconsideration of this ruling, Nintendo may raise the issue at that time.

### Conclusion

For the reasons set forth above, the court grants plaintiff's motion *in limine* to preclude defendants from introducing any evidence concerning Alpex's efforts to compromise disputed claims regarding its patent.

SO ORDERED.