C.J. DUFFEY PAPER COMPANY,
et al., Appellants,

v.

Alfred C. REGER, Respondent.

No. C1–98–1063.

Court of Appeals of Minnesota.

Feb. 2, 1999.

Jerry W. Snider, Charles F. Webber, Kara L. Benson, Faegre & Benson, LLP, Minneapolis, for appellants.

Lewis A. Remele, Jr., Kevin P. Hickey, Bassford, Lockhart, Truesdell & Briggs, Minneapolis, for respondent.

Considered and decided by TOUSSAINT, Chief Judge, KLAPHAKE, Judge, and FOLEY, Judge.

## OPINION

KLAPHAKE, Judge

Appellants,[1] six closely held corporations involved in the paper distribution industry, sued respondent Alfred C. Reger (Reger), their former chief executive officer, on a number of counts, including breach of contract and breach of fiduciary duty. Reger answered and counterclaimed, alleging appellants owed him money under the terms of certain written agreements and for work performed in 1987 and 1988, prior to the termination of his employment.

Following a three-week trial, the jury returned a verdict against appellants on all claims and awarded Reger a total of $6,144,218 in damages. Appellants moved for judgment notwithstanding the verdict (JNOV) or for a new trial, raising issues involving evidentiary rulings and jury instructions. Reger moved for postjudgment interest at the contractual rate of eight percent, rather than the statutory rate of five percent, and for indemnification for attorney fees and disbursements under Minn.Stat. § 302A.521 (1996). The trial court denied appellants' posttrial motion in its entirety, denied Reger's motion for postjudgment interest at the rate of eight percent, and granted Reger's motion for $191,799 in attorney fees and $151,797 in disbursements.

Both parties appeal. Reger filed a separate motion for attorney fees on appeal under Minn.Stat. § 302A.521. We affirm the judgment in all respects, but remand the indemnification issue to the trial court to determine a reasonable amount of fees and disbursements.

## FACTS

In 1945, C.J. Duffey founded the first of the six appellant companies, the C.J. Duffey Paper Company (Duffey Paper). He hired Reger in 1947 to work in the credit and collections department. Reger advanced within the company and was named president of Duffey Paper in 1968.

In March 1977, C.J. Duffey died. His widow, Alice Duffey, and two adult children, Mary Duffey and John Duffey, had little experience in the paper industry and asked Reger to continue running Duffey Paper and the other five companies owned by the Duffey family.

Within a year after C.J. Duffey's death, appellants and Reger began to discuss incentives for him to continue managing the companies. Near the end of 1978, appellants' corporate attorney drafted two employment and deferred compensation agreements (DCAs), one for Duffey Paper and the other for Paper Converting Corporation. Documentation undisputedly established that John Duffey executed the agreements on behalf of the companies, and the boards of directors of

---

1.  C.J. Duffey Paper Company, Paper Converting Corporation, Martin Falk–Minneapolis Company, Martin Falk–Duluth Company, 425 North Washington Corporation, and Performance Service Company.

the two companies unanimously consented, in writing, to the agreements.

The DCAs were incentive based and provided that Reger would receive as deferred compensation 15 percent of the increase in net worth of the two companies for each year the agreements were in effect. The DCAs further provided Reger would receive a "basic salary * * * which shall be fixed from time to time by the Board of Directors." That basic salary was defined as consisting of regular wages or salary and compensation received from "irregular bonuses," profit sharing, and other employee benefits.

In 1981, the parties also entered into a compensation continuation agreement, which was proposed by appellants' insurance agent and funded by a life insurance policy. This agreement essentially provided that Reger would receive $405,000 over a 10– or 15–year period following his termination or retirement.

Between 1977 and 1988, Reger received a regular wage or salary from Duffey Paper only. As chief executive officer of Duffey Paper, Reger continued to follow C.J. Duffey's practices and set his own salary without input from the board of directors. Reger testified that he tried to involve John Duffey in setting salaries and tried to involve other Duffey family members in company finances, but they showed little or no interest.

For the other five companies, Reger's primary compensation consisted of year-end bonuses based on the companies' financial performances. Reger would periodically take advances against his year-end bonuses that never exceeded the amount of year-end compensation and that he always repaid. The advances were recorded in corporate ledgers.

In 1984, the value of the family businesses and John Duffey's responsibilities in running those businesses became central issues in John Duffey's divorce. John Duffey and his attorneys obtained and extensively analyzed the companies' financial information, which included the agreements the companies had with Reger, as well as Reger's compensation and advances. Although John Duffey claimed that he confronted Reger after discovering that Reger had taken a substantial advance in 1985, Duffey admitted that he made no further objection and that he knew Reger continued to take advances. Notably, Reger was Duffey's key witness because he confirmed that the companies' financial gains were due to his own efforts and management and not to Duffey's.

Within months of the conclusion of his divorce, John Duffey began to take a greater interest in managing the companies. On November 6, 1987, appellants gave Reger the 120–day notice required to terminate the DCAs.

For the first time since 1947, Reger did not receive a year-end bonus from Duffey Paper in 1987. When Reger asked John Duffey about his 1987 compensation, Duffey told him that appellants' attorney, Steve Davis, would contact him.

On April 13, 1988, Reger and Davis met. Davis did not claim that any of the written agreements were invalid or that the amounts owed would not be paid, but he did refer to the amounts accrued under the DCAs, which by then approached $2 million, as being a "burden" to appellants. Davis also characterized Reger's overall compensation as "excessive."

Reger, Davis, and John Duffey met on May 6, 1988 to discuss Reger's future employment. Davis and Duffey offered to alter the terms of the DCAs, but did not suggest that these agreements were invalid.

On June 27, 1988, Davis wrote Reger a letter, which was admitted into evidence over appellants' objection, as Exhibit 106E. In that letter, Davis claimed that the DCAs were of "dubious validity" and that they might not be honored, essentially because "neither Agreement was presented to either the board of directors or shareholders for consideration and approval." Davis further suggested that appellants might have claims or "offsets" against Reger. Acknowledging that appellants owed Reger $1,993,720 on the DCAs and $405,000 on the compensation continuation agreement, Davis proposed to reduce the amount owed to $1.4 million and to pay Reger that sum over a period of 15 years, without interest.

Reger testified that he was shocked by the letter and retained an attorney several days later. As of the date of the letter, Reger was still employed by appellants. Appellants terminated Reger on July 11, 1988.

In 1989, appellants sued Reger, seeking damages and rescission of the parties' written agreements. Appellants claimed that Reger had breached the terms of these agreements and his fiduciary duties by awarding himself excessive compensation, converting company money to his own use in the form of interest-free loans or advances, failing to call board meetings or keep the directors informed of significant corporate actions, failing to make annual reports to the shareholders regarding significant corporate liabilities, restricting the shareholders' and directors' access to corporate information, and failing to act with utmost good faith toward appellants.

Reger answered and counterclaimed, seeking amounts due him under the DCAs and the compensation continuation agreement and for compensation owed him for 1987 and 1988. Reger claimed that he continued the management, accounting, and information gathering practices begun by C.J. Duffey; that his compensation was reasonable, particularly in view of the compensation, loans, and other benefits received by the Duffey family during that same time period; and that the Duffey family members were aware of the sums accruing under the terms of the DCAs. Reger further alleged that appellants' claims were waived or barred because appellants had ratified his challenged actions by failing to act promptly when they became aware of them.

Prior to trial, appellants brought a motion in limine, seeking to exclude the June 27, 1988 letter as an offer of settlement under Minn. R. Evid. 408. The trial court denied the motion, concluding that a dispute first arose at some point after Reger had received the letter. This issue was reconsidered multiple times by the trial court at appellants' request.

The evidence presented at trial established that between 1976 and 1988, the companies' value increased substantially, with their net worth almost tripling (from $4 million to $11.7 million) and the average pre-tax incomes more than doubling. By contrast, from 1989 to 1996, when John Duffey served as appellants' chief executive officer, appellants' net worth and average pre-tax incomes did not increase, but decreased slightly. The evidence further showed that Duffey family members benefited greatly during and after Reger's management, amassing approximately $15 million in compensation, dividends, and distributions between 1977 and 1988 and approximately $10 million in distributions from 1989 to 1997.

Both parties presented expert testimony on the issue of the reasonableness of Reger's salary, which averaged $286,000 per year between 1977 and 1988. In concluding Reger's salary was entirely reasonable under the circumstances, Reger's experts compared his salary to the salary of John Duffey, who received an average of $232,000 per year and whose responsibilities as a vice president were much less than Reger's, and to the profits of the companies during Reger's tenure. Appellants' experts reached the opposite conclusion by comparing Reger's salary and compensation to compensation received by other executives in similarly sized or larger companies.

The jury returned a verdict rejecting appellants' claims that Reger had breached his written agreements and his fiduciary duties. The jury found in favor of Reger on all of his claims and awarded him $4,232,962 for breach of the DCAs, $573,117 for breach of the compensation continuation agreement, and $1,338,139 for breach of an implied contract for additional bonuses and compensation for 1987 and 1988.

## ISSUES

I. Did the trial court err in admitting the June 27, 1988 letter in violation of Minn. R. Evid. 408?

II. Did the trial court commit error in its jury instructions?

III. Did the trial court err in denying appellants' motion for JNOV on Reger's implied contract claim?

IV. Did the trial court err in awarding Reger postjudgment interest at the statutory rate of five percent as provided by Minn.Stat. § 549.09, rather than at eight percent as provided by the DCAs?

V. Is Reger entitled to attorney fees on appeal under Minn.Stat. § 302A.521?

## ANALYSIS

### I.

■ Minn. R. Evid. 408 provides in pertinent part:

> Evidence of * * * offering * * * a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for 'another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Rule 408 is a rule of exclusion, not a rule of discretion; thus, if a statement violates the rule, a trial court does not have discretion to admit the statement. 11 Peter N. Thompson, *Minnesota Practice* § 408.01, at 178 n. 4 (1992).

The rule, however, sets out criteria that must exist before the rule is violated and evidence is excluded: (1) the evidence must offer to compromise "a claim which was disputed as to either validity or amount"; (2) the evidence cannot be offered to "prove liability for or invalidity of the claim or its amount"; and (3) the evidence is not offered for another legitimate purpose.

■ In this case, appellants claimed that the trial court erred in admitting the June 27, 1988 letter in which appellants offered to pay Reger a reduced amount in exchange for release of any claims that Reger might have against them. The trial court refused to exclude the letter, reasoning that it did not constitute "compromise of a claim which was disputed" because as of June 27, 1988, a dispute had not yet arisen between the parties.

■ Some federal courts have stated that a "dispute" exists whenever there is "an apparent difference of opinion between the parties as to the validity of a claim." *Alpex Computer Corp. v. Nintendo Co.,* 770 F.Supp. 161, 163 (S.D.N.Y.1991); *see also Affiliated Mfrs., Inc. v. Aluminum Co.,* 56 F.3d 521, 527 (3d Cir.1995) ("actual dispute or a difference of opinion" triggers rule 408). The Minnesota Supreme Court, however, has taken a narrower view and has stated that an "actual controversy" must exist at the time of the alleged offer, thus suggesting that the offer itself cannot be the mechanism that creates the dispute. *In re Commodore Hotel Fire & Explosion Cases,* 324 N.W.2d 245, 247–48 (Minn.1982) (evidence not excluded "unless there existed a dispute as to the validity or amount of the underlying claim"). Thus, in Minnesota, settlement proposals are admissible if they occur before any disagreement or dispute between the parties arises. *See, e.g., Daltex Inc. v. Western Oil & Fuel Co.,* 275 Minn. 509, 515, 148 N.W.2d 377, 382 (1967); *Tagtow v. Carlton Bloomington Dinner Theatre, Inc.,* 379 N.W.2d 557, 562 (Minn.App.1985).

In this case, prior to the June 1988 letter, appellants had never directly asserted any claims against Reger, and Reger, who was still employed and fully expected that appellants would honor the parties' agreements, had no dispute with appellants. Appellants merely acknowledged that they owed Reger almost $2.4 million under the terms of the DCAs and the compensation continuation agreement, but offered to pay him only $1.4 million over a period of 15 years with no interest, in exchange for release of any claims that Reger might have against them. Thus, the letter merely proposes to pay Reger what was then an amount that appellants undisputedly owed him, albeit with a discount. *See Person v. Bowe,* 79 Minn. 238, 239, 82 N.W. 480, 481 (1900) (following em-

ployee's request for payment of agreed-upon amount, employer's offer of present payment, with discount, of then undisputed claim does not fall within common law rule excluding evidence of settlement offers).

Several facts admittedly cloud this issue and weigh in favor of excluding the letter. For instance, the letter itself was couched in terms of settlement of a dispute and included typical settlement documents, including a release of all claims. In addition, the letter was preceded in time by a number of meetings and communications between the parties. These prior meetings and communications, however, merely involved reevaluation of Reger's continued employment and future role with the companies after termination of the DCAs. At no point during these discussions did appellants disclose their intent to challenge the validity of the DCAs or otherwise to refuse to pay Reger the amounts owed him under the parties' agreements. After careful review of the extensive record in this case, we conclude that the trial court did not err in determining that the letter did not constitute an offer to compromise an actual dispute under rule 408.

▪ We further conclude that the trial court was not required to exclude the letter because it was not offered or used by Reger to establish the validity or existence of a claim or its amount. Rather, Reger argued that because the reasons stated in the letter for challenging the validity of the DCAs had no basis in fact, the letter was evidence of appellants' bad faith and was an example of appellants not dealing with him fairly after John Duffey decided to assume responsibility for the companies. While the dissent argues that the evidence was not offered for another purpose, such as to prove bias, prejudice of a witness, or obstruction of justice, the rule does not purport to contain an exhaustive list of legitimate purposes. In this case, this evidence was relevant, and was offered and used to prove bad faith.

▪ Although a disputed claim need not be objectively valid, it must be asserted in good faith. See *Nybladh v. Peoples State Bank,* 247 Minn. 88, 96, 76 N.W.2d 492, 498 (1956). In this case, appellants' June 1988 letter may be characterized as merely a "cov-

er for something more than a settlement." *Paster v. Pennsylvania R.R.,* 43 F.2d 908, 911 (2d Cir.1930); *see also Alpex Computer,* 770 F.Supp. at 164 (settlement offers inadmissible under rule 408 absent evidence that offer baseless or otherwise illegitimate). Throughout his closing argument, Reger's attorney essentially argues just that: the letter demonstrated appellants' bad faith and was merely the culmination of a series of events illustrating this bad faith. While the dissent quotes statements from his final argument as evidence of a clear invitation to view the letter as an admission, when considered in context, these statements may refer to appellants' bad faith.

Nor do we determine that the letter was offered to establish the amount of Reger's claim. The parties never disputed these figures, and Reger's expert, whose testimony on this issue the jury easily could have credited, independently supports them.

Because the letter did not constitute an offer of settlement and was offered neither as evidence of liability or damages, the trial court was not required to exclude it. Accordingly, we do not address the issue of prejudice or whether the trial court somehow compounded any prejudice by (1) failing to give a limiting instruction; (2) prohibiting them from introducing evidence to explain the June 1988 settlement offer; or (3) instructing the jury that appellants' attorney had "stepped out of bounds" when he stated during his closing argument that no further settlement discussions took place after appellants received a report in 1990 from the accounting firm of Coopers & Lybrand that allegedly detailed Reger's conduct and excessive compensation. These issues are all based on the assumption that the letter represented an offer of settlement, an assumption that we have rejected.

## II.

▪ Although a party has the right to have the trial court instruct the jury on matters relating to the party's theory of law of the case, the court has considerable latitude in determining the language used and need not give the exact instructions request-

ed by the party. *Poppenhagen v. Sornsin Constr. Co.*, 300 Minn., 73, 81, 220 N.W.2d 281, 286 (1974); *Smith v. Kahler Corp.*, 297 Minn. 272, 281, 211 N.W.2d 146, 153 (1973). On appeal, we review the trial court's charge in its entirety and from a practical and commonsense point of view and will not reverse unless the instructions constituted an abuse of discretion. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986); *Kalsbeck v. Westview Clinic, P.A.*, 375 N.W.2d 861, 867 (Minn.App. 1985), *review denied* (Minn. Dec. 30, 1985).

At trial, appellants claimed that Reger breached his fiduciary duty by failing to inform the board of directors of his actions, by paying himself excessive salary and bonuses, and by taking loans or advances from the companies. Appellants assert that Reger's testimony provides the evidentiary support for these claims. Reger admitted that he (1) paid himself millions of dollars in salary and bonuses out of the companies over the 12 years he controlled them; (2) entered into the DCAs without taking steps to insure those liabilities were funded; (3) took interest-free loans or advances from the companies; and (4) failed to consult with or notify the board of directors of his actions.

Reger successfully explained his actions at trial. He presented expert testimony that confirmed his actions were reasonable, acceptable, and not unusual for closely held companies like appellants. His own testimony, which the jury obviously found credible, established that he always acted in appellants' best interests, that he merely continued to follow practices established by C.J. Duffey, and that his efforts to involve the board members in making decisions were ignored.

■ Appellants argue the trial court erroneously failed to instruct the jury that Reger bore the burden of proof on appellants' breach of fiduciary duty claims. Appellants' requested instruction was based on their reading of *Westgor v. Grimm*, 318 N.W.2d 56, 59 (Minn.1982). The supreme court has cautioned trial courts to avoid giving instructions drawn from appellate court decisions where the statements of law are misleading or unduly emphasize some facts over others. *Alholm*, 394 N.W.2d at 490–91.

The instructions that the trial court gave included a definition of fiduciary duties and breach of those duties and a burden of proof instruction based on CIVJIG 70.4 *Minnesota Practice* CIVJIG 70 (1986) ("In order to answer any question 'yes,' the greater weight of the evidence must support such an answer, otherwise you should answer the question 'no.' Greater weight of the evidence means that all of the evidence by whomever produced must lead you to believe it is more likely that the claim is true than not true."). When these instructions are read as a whole, we cannot conclude that the trial court erred or otherwise improperly imposed the burden of proof on appellants, particularly when the instruction given followed the recommendation of the jury instruction guide.

■ Appellants also argue that the trial court erred in rejecting their proposed instructions regarding excessive compensation. The first instruction stated that an officer or director has a duty not to take excessive and unreasonable compensation and that paying oneself excessive compensation is a breach of fiduciary duty; the second set out explicit factors used to determine when compensation is excessive.

Within its instruction on fiduciary duties, the court also included a statement that officers must not "serve their own personal interests at the expense of the corporation." From this, appellants could and did argue that Reger breached his fiduciary duty by paying himself excessive amounts of compensation. And while the court did not instruct the jury on the various factors proposed by appellants, those factors were cited and applied by both parties to justify or attack Reger's compensation. Again, we cannot conclude that the trial court's instructions were erroneous. *Poppenhagen*, 300 Minn. at 81, 220 N.W.2d at 286 (if substance of special requested instruction included in general charge, special requested instruction may be denied).

### III.

■ Appellants argue that the trial court erred in including a question on the special verdict form asking the jury if Reger was

entitled to recover on a "implied contract" for compensation allegedly owed him for 1987–88, and in denying their motion for JNOV on this implied contract claim. In his answer and counterclaim, Reger asserted a claim for amounts owed to him for year-end compensation in 1987 and 1988; Reger did not claim he was entitled to these amounts under any implied contract theory. Although the court did not include a separate jury instruction on implied contracts, it did give a general instruction on contracts, which included both express contracts and contracts implied by actions or conduct. *See Roberge v. Cambridge Co-op. Creamery,* 248 Minn. 184, 188–89, 79 N.W.2d 142, 145–46 (1956) (implied contract is one inferred from circumstances and conduct of parties).

■■■■ The selection of questions to be submitted to the jury as special interrogatories falls within the trial court's discretion. *See Colby v. Gibbons,* 276 N.W.2d 170, 178 (Minn.1979). The formulation of special verdict questions must include questions raised by the pleading or evidence that are important to the judgment to be rendered and must be submitted to the jury to ensure the parties their constitutional right to a jury trial. *Hill v. Okay Constr. Co.,* 312 Minn. 324, 340, 252 N.W.2d 107, 118 (1977).

Appellants argue that Reger's own trial testimony demonstrates that there was no implied contract requiring them to pay him bonuses because Reger conceded that the board of directors had complete discretion regarding payment of bonuses and that he understood his bonuses were discretionary. Appellants further argue that the terms of Reger's employment were governed by the DCAs, which provided that Reger would receive a regular wage set by the board and any "irregular" bonuses. But the evidence also established that Reger had received a bonus every year since 1947, that these bonuses were based on the companies' performances, and that the companies' profits again had increased in 1987 and 1988. Given this evidence, we cannot conclude that the trial court abused its discretion in including a special verdict question on an implied contract theory. *See Colby,* 276 N.W.2d at 178.

## IV.

■■■■ By notice of review, Reger challenges the trial court's denial of his motion for postjudgment interest at the rate of eight percent with respect to the $4,232,962 awarded by the jury for breach of the DCAs. The DCAs provided that amounts accrued "shall be credited with interest at the rate of eight percent (8%) * * *, compounded annually."

The trial court agreed with appellants that postjudgment interest on that award should be calculated at the statutory rate of five percent under Minn.Stat. § 549.09, subd. 2. With respect to prejudgment interest, the statute provides for a set rate of interest "[e]xcept as otherwise provided by contract or allowed by law." Minn.Stat. § 549.09, subd. 1(b). With respect to postjudgment interest, however, the statute makes no exception for interest provided by contract; rather, the statute merely provides that "interest shall accrue on the unpaid balance of the judgment or award from the time that it is entered or made until it is paid, at the annual rate provided in subdivision 1," which in this case is five percent. Minn.Stat. § 549.09, subd. 2. *See Kennedy, Matthews, Landis, Healy & Pecora, Inc. v. Young,* 524 N.W.2d 752, 756 (Minn.App.1994) (proper postjudgment interest rate is that set out in Minn.Stat. § 549.09, not six percent rate on general indebtedness set out in Minn.Stat. § 334.01). Application of these different interest rates on prejudgment and postjudgment awards is reasonable, given that a court judgment is inherently more secure than an unliquidated, unsecured claim on a contract. The trial court therefore did not err in calculating postjudgment interest at the rate of five percent.

## V.

On appeal, Reger moves for an award of attorney fees under Minn.Stat. § 302A.521 (1996). Following trial, Reger made a similar motion and the trial court awarded $191,-799.44 in attorney fees and $151,797.51 in disbursements. That award was not challenged below, identified as an issue in appellants' statement of the case, or argued in appellants' briefs. *See Melina v. Chaplin,* 327 N.W.2d 19, 20 (Minn.1982).

Appellants now argue that because they seek a new trial and reversal of the entire judgment, they challenge the trial court's award of attorney fees by implication. They reason that any reversal of the jury's findings would call into question the trial court's determination that the requirements of Minn. Stat. § 302A.521 have been met.

■■■ We reject this argument. The application of Minn.Stat. § 302A.521 is not dependent on which party has prevailed in an action. Rather, it provides for mandatory indemnification of attorney fees and other expenses incurred when a corporate officer or director is made a party to legal proceeding by reason of his or her official capacity, if certain requirements are met. Those requirements include that the officer has acted in good faith, received no improper personal benefit from the conduct at issue, reasonably believed that the conduct was in the best interests of the corporation, and has not been indemnified by another organization. Minn. Stat. § 302A.521; *Barry v. Barry*, 824 F.Supp. 178, 181 (D.Minn.1993), *aff'd*, 28 F.3d 848 (8th Cir.1994).

■■■ Reger requests that this court award fees on appeal, which he estimates may total $50,000. His request is essentially based on the trial court's determination that the requirements of Minn.Stat. § 302A.521 have been met and on appellant's failure to challenge this determination on appeal. Because we agree that appellants failed to properly challenge the trial court's award of fees and because we are otherwise affirming the jury's verdict, we conclude that Reger is also entitled to fees on appeal under Minn.Stat. § 302A.521. Determination of the amount of fees will involve a factual inquiry more appropriately conducted by the trial court. *See In re Marriage of Richards*, 472 N.W.2d 162, 166 (Minn.App.1991); *Katz v. Katz*, 380 N.W.2d 527, 531 (Minn.App.1986), *aff'd*, 408 N.W.2d 835, 840 (Minn.1987). We therefore remand the matter to the trial court to determine the proper amount of reasonable fees and disbursements incurred in defense of this appeal.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn.Const.

# D E C I S I O N

The trial court's judgment is affirmed in all respects.

**Affirmed; motion for attorney fees on appeal remanded.**

DANIEL F. FOLEY,* Judge (dissenting)

I respectfully dissent. It is my firm conviction that the verdict was influenced, if not controlled, by a serious error of law that pervaded the entire case.

My dissent is focused on Minn. R. Evid. 408, a rule that mandates exclusion of evidence of compromise and offers to compromise. I agree with the majority that rule 408 is an exclusionary rule, as distinguished from the body of evidence received during trial at the *discretion* of the trial court. Evidence excluded by this rule may not be received at the discretion of the court; plainly stated, it must be excluded. *See* 11 Peter N. Thompson, *Minnesota Practice* § 408.01, at 178 n. 4 (1992); *Hayes v. Northwood Panelboard Co.*, 415 N.W.2d 687, 690 (Minn.App. 1987) (release that is part of settlement offer must be excluded under rule 408), *review denied* (Minn. Jan. 28, 1988).

Implicitly, erroneous application or employment of rule 408 creates instant prejudice. This is an issue that should be considered de novo on appeal, and it should not be reviewed under the clearly erroneous or greater weight of the evidence standards. I respectfully request the supreme court to review this case and expound on the meaning and purpose of rule 408, to clarify the proper application of the rule for the bench and bar.

Rule 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evi-

art. VI, § 10.

dence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Minn. R. Evid. 408.

I am at a loss to understand why the trial court denied the motion in limine to exclude Exhibit 106E, the June 27, 1988 letter to Reger from Steve Davis, appellants' attorney. I am at a further loss to understand why the court, after returning to the issue four or five times during trial, continued to stubbornly adhere to its ruling. To suggest, as the trial court held, that a dispute arose only *after* receipt of the letter and proposed release is to circumvent rule 408 by disregarding the plain language and obvious meaning of those documents.

Case law establishes that if there is any doubt whether rule 408 applies, a court should exclude the evidence. *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir.1987); *General Tire Co. v. Standard Accident Ins. Co.*, 65 F.2d 237, 240 (8th Cir.1933) (reversing and remanding because of admission of settlement evidence); *Paster v. Pennsylvania R.R.*, 43 F.2d 908, 911 (2nd Cir.1930) (Learned Hand, J.) ("[t]he only way to handle [settlement] evidence is to exclude it"); *Esser v. Brophey*, 212 Minn. 194, 200, 3 N.W.2d 3, 6 (1942). There is also a line of cases holding that a *"dispute"* exists whenever there is an apparent difference of opinion between the parties as to the validity of a claim, lending strength to the argument that the letter was an offer to compromise existing differences. *Alpex Computer Corp. v. Nintendo Co.*, 770 F.Supp. 161, 163 (S.D.N.Y. 1991); *see also Affiliated Mfrs., Inc. v. Aluminum Co.*, 56 F.3d 521, 527 (3d Cir.1995) ("actual dispute or a difference of opinion" triggers rule 408).

The trial court apparently took a very narrow view of the terms "compromise of a claim which was disputed" and reasoned that a dispute had not yet arisen between the parties. However, the letter and attachments cannot be viewed in isolation. Rather, they were preceded in time by a number of meetings and communications, including (1) appellants' cancellation of Reger's contract in November 1987; (2) Reger's testimony that the November 6, 1987 letter from Davis was the "start" of discussions with appellants regarding reevaluation of his employment and compensation; (3) when Reger asked John Duffey why he did not receive his usual year-end bonus in 1987, Duffey merely told him that Davis would get in touch with him; (4) on April 13, 1988, Reger met with Davis and later acknowledged in a letter that Davis had raised "three areas of concern" at the meeting, including the amount of money Reger claimed was owed under his contract, the level of overall compensation Reger had taken out of the companies, and Reger's continuing role in the companies; (5) in May 1988, Reger met with Davis and John Duffey to discuss modification of his contract and Reger's continuing role in the companies; and (6) Reger admitted that the letter represented "a difference between our view" or a "difference of opinion." Thus, it cannot be argued that Reger's receipt of the letter and attachments was entirely unexpected. Rather, the evidence establishes that the parties had been embroiled in a dispute for a significant period of time prior to June 27, 1998.

Moreover, the documents themselves are couched in terms of settlement of a dispute: the letter questions the validity of Reger's employment contract and claims there are potential material offsets. Attached to the letter are typical settlement documents, including a release of all claims. That release states:

> Except for this Agreement and the Consulting Agreement attached hereto as Exhibit A, Reger and the Duffey Companies *mutually release and forever discharge each other of from any and all demands, claims, causes of action,* damages, costs, expenses and/or compensation arising from, connected with or in any growing out of the past, present and future relationship

of the parties, whether known or unknown, direct or indirect which the parties may have or at any time may have had against each other; provided, however, that this paragraph shall in no way affect retirement benefits due or to become due to Reger pursuant to existing plans.

(Emphasis added.) These papers undeniably establish that a "current dispute" or "difference of opinion" existed between the parties.

The majority's reliance on *In re Commodore Hotel Fire and Explosion Cases,* 324 N.W.2d 245 (Minn.1982) is misplaced. Although *Commodore Hotel* requires as a prerequisite to application of rule 408 the existence of a "genuine dispute," that case involved negotiations between a building owner and insurer regarding the value of restoration loss to the building where the amount of the loss was not disputed. *Id.* at 247–48. Here, by contrast, the letter indicates that the parties disagreed about the validity of Reger's contract and the amount he was to be compensated. Thus, *Commodore Hotel* does not control because "a dispute existed during the parties' negotiations."

The majority suggests that receipt of the letter into evidence did not violate rule 408 because the offer was made for a purpose other than settlement. The last sentence of rule 408 provides:

This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Minn. R. Evid. 408. But Reger has never claimed, nor has he made any offer of proof, that this evidence was offered for any of these reasons.

Nor does the record support the majority's assertion that the evidence was used for the limited purpose of proving appellants' "bad faith." To the contrary, repeated references were made to the letter during trial to bolster Reger's claim that the letter was an admission of liability by appellants, and had nothing to do with a question of bad faith. The prejudicial error in receiving into evidence the "offer of compromise" continued to influence the ultimate result, even in the final argument of Regers' attorney, where he pressed the point, stating:

And even so, despite the state of the knowledge that [appellants] had at that time and without knowing all the facts, [appellants] wanted to pay [Reger] almost $2 million.

This is a clear invitation to the jury to use the letter as an admission by appellants of their liability and of the amounts owed Reger. This evidence clearly should have been excluded because it "had strong potential to mislead the jury because the motive behind the offer could be misinterpreted by the jury." *See Hayes,* 415 N.W.2d at 690.

In addition to bolstering the validity of Reger's claims against appellants, admission of the letter correspondingly decreased the validity of appellants' claims. In particular, appellants asserted and presented significant prima facie evidence that Reger had breached his fiduciary duty by (1) receiving, without approval, excessive compensation; (2) signing false company tax returns; (3) taking revolving interest free loans from the companies; and (4) concealing company financial information. The existence and value of these claims is called into question by receipt into evidence of the letter, which offers to settle all claims for $2 million.

Thus, I believe that the trial court erred when it failed to exclude this evidence. Again, because rule 408 is an exclusionary rule, and not a rule of discretion, the fact that there was a three-week trial and that nearly 100 exhibits were received does not answer the question of whether the letter was erroneously received and whether appellants were prejudiced. In my view, the conclusion is inescapable that receipt into evidence of this offer to compromise controlled the result reached in this case, especially because there was no instruction given limiting the purpose and effect of the evidence. *See Esser,* 212 Minn. at 200, 3 N.W.2d at 6; *see also General Tire Co.,* 65 F.2d at 240 (reversing and remanding for new trial because admission of settlement evidence was "obviously prejudicial").

I would therefore reverse and remand for a new trial, free of the taint of any offer to compromise or settle this dispute. A new trial would also correct any alleged impropriety in the court's chastisement of appellants' counsel in the presence of the jury for continuing to object to admission of and reference to the evidence. I would also reverse the award of attorney fees because it is based on the same tainted verdict.